1  MICHAEL J. STORTZ (SBN #139386)
   michael.stortz@dbr.com
2  BETH O'NEAL ARNESE (SBN #241186)
   beth.arnese@dbr.com
3  DRINKER BIDDLE & REATH LLP
   50 Fremont Street
4  20th Floor
   San Francisco, CA  94105-2235
5  Telephone:    (415) 591-7500
   Facsimile:    (415) 591-7510
6
7  Attorneys for Defendant
   AT&T MOBILITY LLC

8
                    UNITED STATES DISTRICT COURT
9
                  NORTHERN DISTRICT OF CALIFORNIA
10

11
   | LOUIS JIRAN AND DELORES | Case No. C-08-00013 CW |
12 | GRESHAM, individually and on behalf of | |
   | a class of similarly situated individuals, | **DECLARATION OF BETH O. ARNESE IN** |
13 | | **SUPPORT OF MOTION TO STAY** |
   |           Plaintiffs, | |
14 | | |
   |           v. | |
15 | | |
   | AT&T MOBILITY, LLC d/b/a The New | **Date**:  September 4, 2008 |
16 | AT&T f/k/a CINGULAR WIRELESS, a | **Time:**  2:00 p.m. |
   | Delaware limited liability company, | **Courtroom:**  2, 4th Floor |
17 | VERISIGN, INC., a Delaware corporation, | |
   | M-QUBE, INC., a Delaware corporation, | |
18 | MBLOX, INC., a Delaware corporation, | |
   | and MOBILE MESSENGER AMERICAS, | |
19 | INC., a Delaware corporation, | |
   | | |
20 |           Defendants. | |
   | BABAK PISHVAEE, individually, and on | Case No. C-07-3407 CW |
21 | behalf of a class of similarly situated | |
   | individuals, | |
22 | | |
   |           Plaintiffs, | |
23 | | |
   |           v. | |
24 | | |
   | VERISIGN, INC., a California corporation, | |
25 | M QUBE, INC., a Delaware corporation, | |
   | and AT&T MOBILITY LLC, formerly | |
26 | known as Cingular Wireless LLC, a | |
   | Delaware corporation, | |
27 | | |
   |           Defendants. | |
28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECLARATION OF BETH O. ARNESE
IN SUPPORT OF MOTION TO STAY                              CASE NO. C-08-00013 CW
SF01/ 597805.1

1    I, BETH O. ARNESE, declare as follows:

2    1.    I am an associate in the law firm of Drinker Biddle & Reath LLP, attorneys of

3    record for defendant AT&T MOBILITY LLC ("AT&T") in the above-referenced matter.  This

4    Declaration is based upon my personal knowledge and, if called upon to do so, I could and would

5    competently testify to the matters set forth below.

6    2.    Attached hereto as Exhibit A is a true and correct copy of Plaintiff Tracie

7    McFerren's Complaint captioned *McFerren v. AT&T Mobility LLC,* No. 2008-EV-004400F in

8    Fulton County, Georgia.

9    3.    Attached hereto as Exhibit B is a true and correct copy of the Settlement

10   Agreement preliminarily approved by Superior Court of Fulton County, Georgia, in the matter

11   captioned *Tracie McFerren v. AT&T Mobility LLC*, No. 2008-EV-004400F.

12   4.    Attached hereto as Exhibit C is the Preliminary Approval Order in the matter

13   captioned *Tracie McFerren v. AT&T Mobility LLC*, No. 2008-EV-004400F.

14   5.    Attached hereto as Exhibit D is a true and correct copy of the Plaintiff's First

15   Amended Complaint in *Pishvaee v. VeriSign, et al.*, Case No. 07-3407 (N.D. Cal.).

16   6.    Attached hereto as Exhibit E is a true and correct copy of Plaintiff's Complaint in

17   *Jiran v. AT&T Mobility LLC, et al.*, Case No. 08-00013, (N.D. Cal.).

18   I declare under penalty of perjury under the laws of the United States of America that the

19   foregoing is true and correct.

20   Executed this 17th day of July, 2008, at San Francisco, California.

21

22                                                    */s/ Beth O'Neal Arnese*
                                                      Beth O'Neal Arnese

23

24

25

26

27

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECLARATION OF BETH O. ARNESE
IN SUPPORT OF MOTION TO STAY        - 2 -                    CASE NO. C-08-00013 CW
SF01/ 597805.1

# EXHIBIT A

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 19214877
Date:  Apr  1 2008 10:36AM
Mark Harper, Clerk

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| TRACIE MCFERREN, individually and on behalf of a class of similarly situated individuals, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action File No. _____ |
| v. | ) ) ) | |
| AT&T MOBILITY, LLC , a Delaware Limited liability company, | ) ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) ) ) | |

----------------------------------------------------x

### CLASS ACTION COMPLAINT

For her complaint against defendant, plaintiff states as follows:

#### Introduction

Plaintiff Tracie McFerren brings this class action complaint against Defendant AT&T Mobility, LLC f/k/a Cingular Wireless ("AT&T") seeking to stop Defendant's unlawful practice of charging cellular telephone customers for products and services the customers have not authorized, a practice which has resulted in Defendant unlawfully collecting money from consumers statewide, and to obtain redress for all persons injured by their conduct. Plaintiff, for her class action complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

#### Parties and Jurisdiction

1.    Plaintiff Tracie McFerren is an Ohio resident.

1

2.      Defendant AT&T Mobility, LLC d/b/a the new AT&T Wireless ("AT&T") f/k/a
Cingular Wireless is a leading provider of cellular telephone service in the United States. AT&T
is a Delaware limited liability company with its headquarters and principal place of business in
the State of Georgia, Fulton County. AT&T can be served through its registered agent, Neal
Berinhout, 5565 Glenridge Connector, Suite 1725B, Atlanta, GA 30342. AT&T does business
and has offices throughout the nation.

3.      The amount in controversy exceeds the sum of $15,000 exclusive of interest, costs
and attorney's fees. This Court has jurisdiction over the subject matter.

4.      Venue is proper in this court.

### Factual Background

5.      This case arises from two closely related phenomena. The first is the capability of
most cellular telephones, not only to make and receive telephone calls, but also to send and
receive text messages, including -- most significantly for present purposes -- "premium" text
message services. These services, also known as "mobile content" include products that range
from the basic (customized ringtones for use with cell phones, sports score reports, weather
alerts, stock tips, horoscope services, and the like) to those requiring more advanced capabilities
(such as direct payment services, interactive radio and participatory television).

6.      The second underlying phenomenon of this case constitutes its very core. That is,
just as providers of premium mobile content, such as Mobile Messenger, deliver their products
by means of cell phone technology, they likewise charge and collect from their customers by
"piggybacking" on the cell phone bills sent out by the wireless carriers, such as AT&T. Further,
because the mobile content providers by themselves most often lack the wherewithal to negotiate
the necessary relationships with the much larger wireless carriers, they do so with the help of

2

third-party companies, such as m-Qube, known as aggregators. These aggregators act as middle-men, representing numerous mobile content providers in arriving at the agreements that allow them to use the billing and collection mechanisms of the wireless carriers. In turn, both the aggregators and the wireless carriers are compensated for their services to the mobile content providers by retaining a substantial percentage of the amount each premium mobile content transaction.

7.    The rapid and largely unplanned growth of the premium mobile content industry has led both to the above-described structure and to a disastrous flaw within it. That flaw — understood, perpetuated, and even encouraged by carriers, aggregators, and mobile content providers such as the instant defendants — is an open secret within the industry, but little understood outside of it. In short, the billing and collection systems established by companies including Defendant in aid of the premium mobile content industry that enriches them are conspicuously free of any checks or safeguards to prevent erroneous and unauthorized charges from being added to customers' bills.

8.    As Defendant also knows, significant amounts of money have been collected on account of such unauthorized charges for premium mobile content in the industry over the last few years. And while it has always been within the power of companies such as Defendant to institute simple and effective measures that would prevent this, they have instead knowingly maintained the very system that has allowed these erroneous charges. Indeed Defendant have reaped and retained their respective shares of the improper collections.

9.    While the total sales in Georgia of premium mobile content in 2007 amount to a significant sum, the business is still in its infancy. The burgeoning industry has already expanded from ordinary ringtones into mass media-related products such as interactive radio and

3

participatory voting at television and concert events and, most recently, into services that enable cell phones to function as credit cards. Unchecked, Defendant's practices will injure an ever-increasing number of unwitting consumers, inflicting damages of an untold magnitude.

10.    Unlike transactions made using checks and credit cards, which require a signature or a highly private sixteen-digit credit card number, the only thing a mobile content provider needs to charge a consumer for its products is the consumer's cellular telephone number. Once a mobile content provider has a consumer's cell phone number, it can cause that consumer to be billed for services and products irrespective of whether the consumer actually agreed to purchase them.

11.    Armed with only a cell phone number, the mobile content provider can simply provide that number, along with an amount to be charged, to a billing aggregator (such as m-Qube or mBlox). The aggregator, in turn, instructs the relevant cellular carrier to add the charge to the bill associated with that cell phone number. The charge will then appear on the consumer's cell phone bill, often with only minimal, cryptic identifying information.

12.    Because the protections normally present in consumer transactions -- such as signatures and private credit card numbers -- are absent from this process, the likelihood of false charges increases enormously. And because a substantial part of mobile content "sales" are effected through web sites using misleading, oblique, or inadequately explained "consent" procedures, that likelihood increases by another order of magnitude. Mobile content providers have powerful financial incentives to collect as many cell phone numbers as possible but little incentive to ensure that the owners of those numbers have truly agreed to purchase their goods and services.

4

13.    While aggregators charge their content provider customers some upfront fees, their revenue is primarily generated through a "revenue share" on transactions for which they bill cell phone subscribers: each time a charge is incurred in connection with the purchase of mobile content services offered by a content provider, the aggregator and/or the content provider cause said charge to be billed directly on the cellular telephone bill of the carrier's customer who currently owns and/or uses the telephone number (claimed to be) associated with said purchase.

14.    The carrier then bills and collects the charge from its current subscriber, retains about a portion of the proceeds as its "revenue share" and then remits the balance to the aggregator who has direct access to its network, who retains a percentage of the balance in the form of its own "revenue share," and then remits the remainder directly to the mobile content provider.

15.    AT&T uses uniform form contracts ("Service Agreements") under which customers purchase cell phone services.

16.    As described above, AT&T's services include providing access to and billing for various third-party mobile content services such as ring tones, chat services, horoscopes, stock tips, weather alerts, participatory television, mobile payment services and other forms of software provided by hundreds of third-party vendors with names such as New Motion and many others.

17.    AT&T has contracted with third-party providers to bill and collect from AT&T's customers the services provided by such third-party content providers, the charges for which are included directly on a customer's monthly wireless bill.

18.    The duty of good faith and fair dealing, a part of every contract, requires that AT&T not bill any customer for any good or service not authorized by the customer.

5

19.    Upon execution of said Service Agreements and activation of cellular telephone accounts, AT&T provides its customers a ten-digit cellular telephone number.

20.    As explained above, unbeknownst to its customers, AT&T frequently charges consumers for services that were never authorized.

21.    As a result, AT&T has for years been systematically, repeatedly and without authorization, billing its customers for purchase of products and services not agreed to by those customers.  AT&T and third-party service providers have, on information and belief, profited significantly through this practice.

22.    AT&T's conduct is by no means accidental. As previously alleged, it knows that many of its cellular telephone customers dispute the claim the mobile content provider's claim that such customer consented to be charged for their mobile content services. AT&T further knows that it cannot authenticate such customer's authority to be billed for such mobile content charges. In light of its knowledge of these facts, AT&T's decision to continue to charge its customers for mobile content without taking steps to authenticate the representations of the mobile content providers that the customer's authority to be charged was obtained constitutes a deliberate and willful scheme to cheat large numbers of people out of small amounts of money.

23.    Because the amount AT&T is taking is small on an individual basis – as little as a few dollars to at most several hundreds of dollars per person -- and because of AT&T's vast resources and superior bargaining power, Defendant employ this scheme with the hope and expectation that its illegal conduct will go unpunished.

### The Facts Relating to Named Plaintiff

24.    In or about 2006, Plaintiff purchased new cell phone service for her family's personal use from an authorized AT&T sales representative.

25.    On that same day, in exchange for an AT&T cell phone service plan, Plaintiff agreed to pay a specific amount each month for a period of approximately 12 months.

26.    Upon activating her cellular telephone account, AT&T provided Plaintiff a cellular telephone number.

27.    In or about late 2007, Plaintiff's cell phone account was charged for multiple unwanted mobile content services in the form of "premium" text messages from mBlox, Inc. and/or m-Qube, Inc. , third party providers of mobile content services.

28.    At no time did Plaintiff authorize the purchase of these products and services offered by Defendant and/or its agents at no time did Plaintiff consent to their sending of text messages to her cellular telephone.

29.    During the relevant time period, Defendant caused Plaintiff to be charged service fees in varying amounts for so-called "Premium" text messages and mobile content downloads provided by Defendant and/or its agents.

30.    At no time did Plaintifff authorize Defendant or anyone else to bill her for these services.

31.    At no time did Defendant verify Plaintiff's purported authorization of these charges and no time did Defendant provide a complete refund consisting of the premium text message charges, ordinary text messages, data charges and/or back interest. Nor did AT&T provide Plaintiff an assurance that such unauthorized charges would not appear in future billing periods.

### Class Representation Allegations

32.    Plaintiff brings this action on behalf of herself and a class consisting of all AT&T wireless telephone subscribers in the nation who suffered losses or damages as a result of AT&T

7

billing for mobile content products and services not authorized by the subscriber (the "Carrier Class") provided, however, that the following are excluded from this proposed Class: (i) Defendant, and (ii) any employee of Defendant.

33.    **Numerosity.** The class consists of thousands of members throughout the State of Georgia and the nation. The membership of the class is so numerous that joinder of all of them in this lawsuit would be impractical.

34.    **Typicality.** The claims of Plaintiff are typical of the claims of all of the other members of the Class. The practices of Defendant are and have been uniform with regard to all class members. And the contracts that Defendant has entered into with the class members are substantially identical. Defendant's actions also have affected the members of the class in similar ways. Members of the class have sustained damage as a direct result of the wrongful conduct described in this complaint.

35.    **Adequacy of Representation.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions.  Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the other members of the Class, and have the financial resources to do so.  Neither Plaintiff nor her counsel has any interest adverse to those of the other members of the Class.

36.    **Common Questions of Law and Fact.** Absent a class action, most members of the Class would find the cost of litigating their claims to be prohibitive, and will have no effective remedy.  The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

37.     Defendant has acted and failed to act on grounds generally applicable to the plaintiff and the other members of the respective Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class.

38.     The factual and legal bases of Defendant's liability to Plaintiff and to the other members of the respective Class are the same, resulting in injury to the Plaintiff and to all of the other members of the Class.  Plaintiff and the other Class members have all suffered harm and damages as a result of Defendant's unlawful and wrongful conduct.

39.     There are many questions of law and fact common to the claims of Plaintiff and the other members of the respective Class, and those questions predominate over any questions that may affect individual members of the Class.  Common questions for the Class include but are not limited to the following:

(a)     Whether AT&T's conduct described herein is in breach of contract; and

(b)     Whether AT&T's conduct described herein violates Georgia Code § 46-5-171.1.

## COUNT I
### (Breach Of Contract on behalf of the Class)

40.     Plaintiff incorporates by reference the foregoing allegations.

41.     Plaintiff and the Class entered into substantially identical agreements with Defendant AT&T whereby Plaintiff and the AT&T agreed to pay a certain sum of money in exchange for AT&T's activation of Plaintiff and the AT&T's cellular telephone account and its promise to provide various communication and related services to Plaintiff and the Class.

9

42.    Defendant AT&T expressly and/or impliedly agreed to provide Plaintiff and the Class with a cellular telephone number free of unauthorized charges for third-party products and services.

43.    Defendant AT&T further expressly and/or impliedly agreed to bill Plaintiff and the Class only for products or services the purchase of which they had authorized.

44.    Defendant AT&T further expressly and/or impliedly agreed to carry out its obligations in good faith and fair dealing.

45.    Defendant AT&T breached its contractual obligations by providing Plaintiff and the Class with cellular telephone accounts that included unauthorized charges for mobile content.

46.    Defendant AT&T further breached its contractual obligations, including its contractual obligation of good faith and fair dealing, by thereafter billing Plaintiff and the Class for products or services, the purchase of which they never authorized.

47.    The aforementioned breaches of contract have proximately caused the Plaintiff and the Class economic injury and other damages.

## COUNT II
### (Violation of Georgia Code § 46-5-171.1 on behalf of the class)

48.    Plaintiff incorporates by reference the foregoing allegations.

49.    Defendant provided Plaintiff and the other class members with local telephone service.

50.    Defendant charged Plaintiff and the other class members for third-party content, as alleged elsewhere in this Complaint.

10

51.    Plaintiff and the other class members did not consent or authorize these services. Defendant does not have any evidence that Plaintiff or the other class members gave prior express authorization for those third-party content services.

52.    In violation of Georgia Code § 46-5-171.1, the invoice for charges for such services were not clear, conspicuous, separate, and distinct manner so as to ensure that the customer is aware of such charges.

WHEREFORE, Plaintiff Tracie McFerren, on behalf of herself and the Class, prays for the following relief:

a.    Certify this case as a class action on behalf of the Class as defined above and appoint Tracie McFerren Class Representative, and appoint the undersigned counsel as lead counsel;

b.    Declare that the actions of AT&T, as set out above, constitute a breach of contract and violates Georgia state law;

c.    Enter judgment against AT&T for all economic, monetary, actual, consequential, and compensatory damages caused by its conduct, and if its conduct is proved willful, award Plaintiff and the Class exemplary damages;

d.    Award Plaintiff and the Class reasonable costs and attorneys' fees;

e.    Award Plaintiff and the Class pre- and post-judgment interest;

f.    Enter judgment for injunctive, statutory and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

g.    Award such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: March 31, 2008.

11

Respectfully submitted,

BOONE & STONE

David Wm. Boone
Georgia State Bar No. 067730
Simone R. Siex
Georgia State Bar No. 645858

3166 Mathieson Drive
Atlanta, Georgia 30305
TEL    404/239-0305
FAX    404/239-0520

By:   /S/William S. Stone
William S. Stone
Georgia State Bar No. 684636

P. O. Drawer 70
Blakely, Georgia 39823
TEL    229/723-3045
FAX    229/723-4834

# EXHIBIT B

**IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA**

TRACIE MCFERREN, individually and on behalf )
of a class of similarly situated individuals, )
                                     )
                   Plaintiff, )      No.
                                       )
                 v. )      Judge Bonner
                                       )
AT&T MOBILITY LLC, )
                                       )
                 Defendant. )

<u>**CLASS ACTION SETTLEMENT AGREEMENT**</u>

       THIS CLASS ACTION SETTLEMENT AGREEMENT (the "Agreement") is entered by

and among Plaintiff in this Action, for herself and on behalf of the Settlement Class, and AT&T

Mobility LLC ("AT&T Mobility") (together, the "Parties"). Subject to Court approval as required by

the applicable law and rules, and as provided herein, the Parties hereby stipulate and agree that, in

consideration of the promises and covenants set forth in this Agreement and upon the entry by the

Court of a Final Order and Judgment, this Action shall be settled and compromised upon the terms

and conditions contained herein.

       WHEREAS, Plaintiff filed this action captioned *McFerren v. AT&T Mobility LLC*, No. 2008-

EV-004400F (Fulton County, GA) (the "Complaint"), alleging claims for damages and injunctive

and declaratory relief against AT&T Mobility arising out of the sale and marketing of Third Party

Mobile Content, such as ring tones, wallpaper, news and information alerts, and other digital and

electronic content to AT&T Mobility wireless telephone subscribers; and

       WHEREAS, a number of putative class actions have been filed by Class Counsel and

members of the Plaintiff's Steering Committee against and/or involving AT&T Mobility and certain

Third Party Content Providers and related entities, including VeriSign, Inc. ("VeriSign"), M-Qube,

Inc. ("M-Qube"), Jamster International, SARL ("Jamster") and Mblox, Inc. ("Mblox") (together with

the other entities identified below, the "Third Party Content Providers") regarding the marketing and

sale of Third Party Mobile Content. These actions are listed below and defined herein as the

Coordinated Actions; and

      WHEREAS, other putative class actions have been filed by Class Counsel and members of

the Plaintiff's Steering Committee, alleging claims arising out of the imposition of charges for Third

Party Mobile Content authorized by the previous owner of a mobile number but not the current

owner charged for the Mobile Content. These actions are listed below and defined herein as the

Recycled Number Actions; and

      WHEREAS, AT&T Mobility has denied and continues to deny all Plaintiff's claims in the

Action and other similar actions, and has denied any wrongdoing or liability to all plaintiffs in all of

the pending actions; and

      WHEREAS, Class Counsel have conducted an examination and investigation of the facts and

law relating to the matters set forth in the Complaint regarding the claims and potential defenses of

AT&T Mobility; and

      WHEREAS, the Parties have engaged in extensive, arms-length negotiations, including

multiple, in person sessions in front of Rodney Max, Esquire, Upchurch Watson White & Max

Mediation Group in his capacity as a mediator, and reached this settlement agreement; and

      WHEREAS, based upon extensive analysis of the facts and the law applicable to Plaintiffs'

claims in the Coordinated Actions, and taking into account the burdens and expense of litigation,

including the risks and uncertainties associated with protracted trials and appeals, as well as the fair, cost-effective and assured method of resolving the claims of the Settlement Class, Class Counsel have concluded that this Agreement provides substantial benefits to the Settlement Class and the public as a whole, and is fair, reasonable, adequate and in the best interests of Plaintiff and the Settlement Class; and

WHEREAS, AT&T Mobility has similarly concluded that this Agreement is desirable in order to avoid the time, risk and expense of defending multiple and protracted litigation, and to resolve finally, completely and globally the pending and potential claims of Plaintiff and the Settlement Class, and thus to resolve all of the litigation pending and described above; and

WHEREAS, the Parties agree that all potential Settlement Class Members shall have an individual right to be excluded ("opt out") from the Settlement Class (as provided in this Agreement), such that participation in the settlement benefits shall be voluntary;

NOW, THEREFORE, the Parties stipulate and agree that any and all Settled Claims against all Released Parties regarding the marketing and sale of Third Party Mobile Content to AT&T Mobility subscribers shall be finally settled and resolved on the terms and conditions set forth in this Agreement, subject to Court approval of this Agreement, as a good faith, fair, reasonable and adequate settlement under applicable rules, regulations and laws.

I.    **DEFINITIONS**

As used in this Agreement and the exhibits hereto, in addition to any definitions set forth elsewhere in this Agreement, the following terms shall have the meanings set forth below:

"*Action*" means the case captioned *McFerren v. AT&T Mobility LLC*, No.____,

3 of 32
SETTLEMENT AGREEMENT

(Fulton County GA).

"*Account Holder*" means any Person with an account for wireless service with AT&T Mobility.

"*Account Holder Claims*" means any claims arising out or relating to a charge to any Account Holder for Third Party Mobile Content, including all claims that were brought or could have been brought in the Action, the Coordinated Actions or the Recycled Number Actions.

"*Agreement*" means this Settlement Agreement (including all exhibits hereto).

"*Approved Claim*" means a claim by a member of the Settlement Class that is a timely (submitted before the Claims Deadline), truthful, and complete claim and that provides at least the following information:

> (i) . Full name, current address, home phone number, current or former AT&T Mobility wireless number and/or AT&T Mobility wireless account number;

> (ii) Total amount of refund sought, along with the date, description of charge, and amount of each Third Party Mobile Content charge to be refunded;

> (iii) Certification under oath that each of these charges for which a refund is sought was unauthorized and that no refund was previously sought and/or provided on any such charge.

"*AT&T Mobility*" means AT&T Mobility LLC, f/k/a Cingular Wireless LLC, and all of its current and former parents, affiliates, subsidiaries, predecessors, successors and assigns.

"*AT&T Mobility's Counsel*" means Drinker Biddle and Reath LLP and McKenna, Long & Aldridge LLP.

"*Claimant*" means a person or entity that submits a claim form for a Settlement Benefit.

"*Claim Form*" means the form attached hereto as Exhibit 1, as it may be revised and as approved by the Court.

"*Claims Administration Expenses*" means the expenses incurred by the Claims Administrator in handling claims by Class Members.

"*Claims Administrator*" means the Person selected by the Parties and approved by the Court to oversee the processing and payment of Class Members' claims as set forth in this Agreement. The Parties agree that Rust Consulting shall perform the duties of Claims Administrator and shall act as Claims Administrator.

"*Claims Deadline*" means the date by which all Claims Forms must be received to be considered timely and shall be set as the date ninety (90) days after entry of the Judgment. The Claims Deadline shall be clearly set forth in the Court Order granting final approval of this Agreement as well as on the front page of all Claims Forms.

"*Class Counsel*" means Lead Class Counsel consisting of attorneys Jay Edelson, Scott Kamber and Myles McGuire of KamberEdelson, LLC and "Liaison Class Counsel" consisting of David W. Boone, William S. Stone and Aileen Page of Boone & Stone.

"*Class Notice*" means the form of Court-approved notice (or notices) of this Settlement Agreement that are directed to the Class. The Parties have proposed that the Court approve the notices in the form of Exhibits 2, 3 and 4 to this Agreement.

"*Class Representatives*" shall mean the plaintiff in this Action, Tracie McFerren, as well as

the following plaintiffs from the Coordinated Actions: Morris Fiddler and Kristen Hensley.

"*Coordinated Actions*" means the following pending class actions filed or pending in other state or federal courts asserting similar class claims whose plaintiffs and counsel have agreed to the terms and conditions of this settlement: *Baker v. Sprint, New Motion, Inc.*, 2007-46363 (Fl. St. Ct.); *Dedek v. AT&T Mobility LLC*, Case No. BC387728, (Sup. Ct. L.A. County); *Fiddler v. AT&T Mobility LLC, et al.*, Civ. A. No. 08-0416, (N.D. Ill.); *Goddard v. Google, Inc.* BC 667876 (Cal.St.Ct.); *Gray v. Verizon, Mobile Messenger Americas, Inc.*, 07-36302 (Fl. St. Ct.); *Hensley v. AT&T Mobility LLC* (Dist. Ct., 4th Jud. Dist., Hennepin Cty, Minn.); *Jiran v. AT&T Mobility LLC, et al.*, Civ. A. No. 08-00013, (N.D. Cal.), *Paluzzi v. mBlox, et al.*, No: 2007-CH-37213 (Cook Cty, Illinois), *Thielen v. Buongiorno USA, Inc.*, 1:06-cv-00016 (W.D. Mich.); *Walsh v. mBlox, et al.*, No. BC. BC 382356 (Cal.St.Ct.), *Warren et al. v. Verisign, et al.* No. 6:2007cv02043 (M.D. Fl.) and *White v. AT&T Mobility* (Supreme Court of New York County) and the Recycled Number Actions.

"*Court*" means the Superior Court of Fulton County, Georgia.

"*Defendant*" means AT&T Mobility.

"*Effective Date*" means the date on which the Judgment becomes final and not subject to appeal under the applicable law or, in the event of a timely appeal from the entry of the Judgment, the date on which such appeal is resolved and the Judgment is not subject to further review.

"*Fairness Hearing*" means the hearing to be conducted by the Court to determine the fairness, adequacy and reasonableness of this Settlement Agreement in accordance with applicable jurisprudence.

"*Judgment*" means the Order and Final Judgment to be entered by the Court, approving this Agreement without material alterations, as fair, adequate and reasonable in accordance with

applicable jurisprudence, confirming the certification of the Class, and issuing such other findings and determinations as the Court or the parties deem necessary and appropriate to effectuate the terms of this Agreement.

"*Mediator*" means Rodney Max, Esquire of Upchurch Watson White & Max Mediation Group.

"*Mobile Content*" refers to content, applications, and goods and services such as ring tones, wallpaper, news and information alerts, and other digital and electronic content charged to the wireless bill of an Account Holder.

"*Nationwide*" means the 50 United States and its territories.

"*Notice Date*" means the date upon which Class Notice is first disseminated to the Class.

"*Notice Expenses*" means all reasonable costs and expenses expended in the execution of the Notice Plan, including (i) all reasonable costs and expenses incurred in connection with preparing, printing, mailing, disseminating, posting, promoting, emailing, internet hosting and publishing the Notice to the Class of the proposed Settlement, identifying and notifying Class Members and informing Class Members of the proposed settlement and (ii) any necessary notice and notice-related expenses.

"*Notice of Intention to Appear and Object*" is the written communication that may be filed by a Class member in order to object to this Agreement.

"*Notice Plan*" means the proposed plan of disseminating notice of the Agreement to Class Members.

"*Opt-Out Period*" means the period for filing a Request For Exclusion to be set by the Court in this action. The deadline for filing Opt-Outs will be clearly set forth in the Class Notice.

SETTLEMENT AGREEMENT

"*Person*" means any individual, corporation, trust, partnership, limited liability company or other legal entity and their respective successors or assigns.

"*Plaintiff*" means Tracie McFerren and the Settlement Class.

"*Plaintiff's Steering Committee*" means the committee consisting of chairman Robert Shelquist of Lockridge Grindal Nauen, P.L.L.P., Orin Giskan, of Solotaroff, Anderson & Stewart, LLP, David Healey of the Offices of David Healy and John Jacobs of The Jacobs Law Firm, Chtd.

"*Preliminary Approval*" means the Court's conditional certification of the Class, preliminary approval of this Agreement, and approval of the form and dissemination of Class Notice.

"*Recycled Number Actions*" means actions arising out of the imposition of charges for Third Party Mobile Content authorized by the previous owner of a mobile number but not the then-current owner such as *Jiran v. AT&T Mobility LLC, et al.*, Civ. A. No. 08-00013, (N.D. Cal.), *Valdez v. Buongiorno USA, Inc., m-Qube, Inc.* 4:07-cv-06496-CW (N.D. Cal.); *Knox v. m-Qube, Inc.* 1:07-cv-10124 (D.Mass.).

"*Released Party*" means Defendant (as defined above) and the Third Party Providers (as defined below) including their respective predecessors, successors, assigns, parents, subsidiaries, divisions, departments, and affiliates, and any and all of their past, present and future officers, directors, employees, stockholders, partners, agents, servants, successors, attorneys, representatives, subrogees and assigns of any of the foregoing.

"*Releasing Party*" means Plaintiff and each member of the Settlement Class and any Person claiming by or through him/her/it as his/her/its spouse, child, heir, associate, co-owner, attorney, agent, administrator, devisee, predecessor, successor, assignee, representative of any kind, shareholder, partner, director, employee, or affiliate.

"***Request For Exclusion***" is the written communication that must be filed with the Claims Administrator that is postmarked on or before the end of the Opt Out Period if a Class Member wishes to be excluded from the Settlement Class.

"***Settled Claim***" means any claim, liability, right, demand, suit, matter, obligation, damage, loss or cost, action or cause of action, of every kind and description that the Releasing Party has or may have, including assigned claims, whether known or unknown, asserted or unasserted, latent or patent, that is, has been, could reasonably have been or in the future might reasonably be asserted by the Releasing Party either in the Action or in any other action or proceeding in this Court or any other court or forum, regardless of legal theory, and regardless of the type or amount of relief or damages claimed, against any of the Released Parties arising out or relating to a charge to any Account Holder for Third Party Mobile Content, including all claims that were brought or could have been brought in the Action, the Coordinated Actions or the Recycled Number Actions, and involving any allegation on any basis that such charge was unauthorized. Settled Claims include, *inter alia*, claims that the Third Party Mobile Content charges were the result of fraudulent or misleading marketing or billing practices, the actions of minors who did not have the capacity to agree to such charges, or that were the result of receiving a "recycled" cellular telephone number. Without limiting the generality of the foregoing, Settled Claim shall include, with regard to the foregoing subject matter:

(1)    any class, group, collective or individual claim for any breach or violation of any federal or state statute, case law, common law or other law;

(2)    any claim for breach of any duty imposed by law, by contract or otherwise; and

(3)    any claim for damages, injunctive relief, declaratory relief, class damages or relief, penalties, punitive damages, exemplary damages, restitution, rescission or any claim for damages based upon any multiplication or enhancement of compensatory damages associated with the above.

"*Settlement Benefit*" means the benefits a Settlement Class Member may receive pursuant to this Settlement Agreement.

"*Settlement Class*" shall consist of all current and former AT&T Mobility Account Holders Nationwide who, at any time from January 1, 2004 to the Notice Date, were billed for Third Party Mobile Content.  Excluded from the Class are the following:  the Defendant, the Third Party Providers, the Claims Administrator, the Mediator, and any of their respective parent, subsidiary, affiliate or control person of the Defendant, as well as the officers, directors, agents, servants, or employees of the Defendant, any trial judge presiding over this case over any of the actions which comprise the Action or Coordinated Actions, and the immediate family members of any such Person(s).

"*Special Master*" means an independent person agreed upon by the parties to evaluate those claims that have been challenged by AT&T Mobility or rejected by the Claims Administrator after an initial appeals process.

"*Third Party Mobile Content*" means Mobile Content sold by Third Party Providers directly to AT&T Mobility wireless customers and charged to the wireless bill of one of AT&T Mobility's wireless customers, and excludes Mobile Content sold through the AT&T Media Mall or directly by AT&T Mobility to such Account Holders.

"*Third Party Providers*" means entities other than AT&T Mobility who advertise, aggregate billing for, offer, and/or sell Third Party Mobile Content, including Third Party Mobile Content

Subscriptions, directly to AT&T Mobility's wireless customers as well as their marketing agents and/or licensors, and includes VeriSign, M-Qube, Jamster International SARL, and Mblox. Providers who sell Mobile Content on or through AT&T Mobility's Media Mall are not thereby Third Party Providers for the purposes of such sales.

## II.    FOR SETTLEMENT PURPOSES ONLY

A.    This Agreement, whether or not consummated, and any proceedings taken pursuant to this Agreement are for settlement purposes only, and neither the fact of, nor any provision contained in this Agreement or its exhibits, nor any action taken hereunder shall constitute, be construed as, or be admissible in evidence as any admission of the validity of any claim or any fact alleged by Plaintiff in this Action or in any other pending action or of any wrongdoing, fault, violation of law, or liability of any kind on the part of AT&T Mobility or admission by AT&T Mobility of any claim or allegation made in this Action or in any other action, nor as an admission by Plaintiff, Settlement Class Members or Class Counsel of the validity of any fact or defense asserted against them in this Action or in any other action.

B.    This Agreement is without prejudice to the rights of AT&T Mobility to: (i) seek to compel arbitration of any claim in any forum, excepting claims arising under this Agreement by class members who have not opted-out; (ii) oppose Class certification in this Action should this Agreement not be approved or implemented for any reason; (iii) oppose certification in any other proposed or certified class action; or (iv) use the certification of the Class to oppose certification of any other proposed or existing class arising out of or related to the Settled Claims.

**III.    REQUIRED EVENTS AND COOPERATION BY THE PARTIES**

**A.    Preliminary and Final Approval**

Promptly after execution of this Agreement, Class Counsel shall submit this Agreement to the Court for its Preliminary Approval and shall move the Court for one or more orders which by their terms shall:

1.    Appoint the Class Representatives as the representatives of the Settlement Class;

2.    Appoint Lead and Interim Class Counsel, as well as the Plaintiff's Steering Committee;

3.    Preliminarily and conditionally certify the Class under Ga. Code Ann., § 9-11-23 for settlement purposes only and preliminarily approve this Agreement for purposes of issuing notice to the Class;

4.    Approve the form and contents of the Settlement Class Notice and the method of its dissemination to Class Members;

5.    Provides for appropriate confirmatory discovery; and

6.    Schedule the Fairness Hearing to review comments and/or objections regarding this Agreement, to consider its fairness, reasonableness and adequacy, and the application for an award of attorneys' fees and reimbursement of expenses and to consider whether the Court shall issue a Judgment approving the Settlement, granting Class Counsel's application for fees and expenses, and dismissing the Action with prejudice.

**B.     Cooperation**

The Parties shall, in good faith, cooperate, assist and undertake all reasonable actions and steps in order to accomplish these required events on the schedule set by the Court.

**C.     Dismissal of Coordinated Actions**

Class Counsel shall dismiss, with prejudice, the Coordinated Actions or, to the extent appropriate, amend the pleadings to limit the respective classes to exclude Settled Claims, no later than thirty (30) days following the Effective Date, and shall cooperate in seeking stays of such actions as to Settled Claims prior to the Effective Date.

**D.     Certification of Settlement Class**

For settlement purposes only, AT&T Mobility and the Settlement Class stipulate to the certification of the Settlement Class, as defined above.

This Agreement is contingent upon the Court finally certifying the Settlement Class as defined in the preceding paragraph. Should the Court fail to certify the Settlement Class substantially as defined in the preceding paragraph, the Parties shall each have the option of rescinding this Agreement within 10 business days of the date the Court grants final certification of the class in this Action. Should the Court fail to certify a class or approve this Agreement, this Agreement may not be used by the Parties for any purpose related to class certification.

**IV.     SETTLEMENT BENEFITS**

**A.     Service Improvements and Assurances.** AT&T Mobility has agreed that it shall, as soon as practicable but in no event later than a date 45 days after preliminary approval is entered in this action, institute the following:

1.    AT&T Mobility shall include in its Wireless Service Agreement a disclosure concerning Mobile Content substantially consistent with the following:

Mobile Content

I understand that wireless devices may be used to purchase goods, content, and services (including subscription plans) like ring tones, graphics, games, horoscopes and news alerts from AT&T and other companies ("Mobile Content").   I understand that I am responsible for all authorized charges associated with such purchases from any device assigned to my account, that these charges will appear on my bill (including charges on behalf of other companies), and that such purchases can be restricted by using parental controls available from your AT&T salesperson, at www.wireless.att.com, or by calling AT&T.

2.    AT&T Mobility shall post on its website a disclosure concerning Mobile Content substantially consistent with the following:

Your wireless devices may be used to purchase goods, content, and services (including subscription plans) like ring tones, graphics, games and news alerts, from AT&T or other companies ("Mobile Content").   You are responsible for all authorized charges associated with such purchases from any device assigned to your account. Charges for Mobile Content will appear on your bill (including charges on behalf of other companies), and Mobile Content purchases can be restricted by use of parental controls or similar features.   Parents should consider using parental controls available from

14 of 32
SETTLEMENT AGREEMENT

AT&T. Please visit our website at www.wireless.att.com or speak with an

AT&T customer representative for further information.

3.    All bills, electronic and paper, will disclose the telephone number for Account

Holders who seek to dispute a charge to call and reach an appropriate customer service representative

as well as the website address for performing the same.

4.    AT&T Mobility will continue to provide and enhance as necessary the systems,

processes and training to support the ability for Account Holders to have a free and ready means to

address billing issues and cancel Third Party Mobile Content subscriptions via a single point of

contact or through an equally effective means to address such issues.

**B.    Refund Benefit.**

1.    *Refunds.*  AT&T Mobility shall credit or refund any current or former

Account Holder who submits a valid and timely Claim Form for the amount of past unauthorized

charges for Third Party Mobile Content purchases ("Settlement Benefit") billed to a member of the

Settlement Class, subject to the provisions of this Settlement Agreement and in accordance with the

claims process set forth herein.

2.    *Subscription Charge Claims.*  With respect to any Account Holder Claims

relating to charges associated with Third Party Mobile Content sold by subscription, the Settlement

Benefit shall be capped at an amount equal to three times the monthly subscription charge.

**V.    CLAIMS PROCESS**

**A.    Claims Administrator's Duties**    The Claims Administrator shall, under

the supervision of the Court, administer the relief provided by this Settlement Agreement by

resolving claims in a rational, responsive, cost effective and timely manner.  The Claims

15 of 32
**SETTLEMENT AGREEMENT**

Administrator shall maintain reasonably detailed records of its activities under this Agreement. The Claims Administrator shall maintain all such records until expiration of the Term of Agreement and such records will be made available to Class Counsel and AT&T Mobility's Counsel. The Claims Administrator shall also provide reports and other information to the Court as it may require. The Claims Administrator shall provide Class Counsel and AT&T Mobility's Counsel with such information concerning notice, administration and implementation of the Settlement. Should the Court request, the Parties, in conjunction with the Claims Administrator, shall submit a timely report to the Court summarizing the work performed by the Claims Administrator, including a report of all amounts paid to Class Members. The Claims Administrator shall cause a website to be created containing claims information and relevant documents. The Parties shall agree on all information and documents to be posted on this website.

**B.      Written and Electronic Claims Submission**

Settlement Class Members are entitled to Settlement Benefit(s) through submission of an Approved Claim. The claims process shall be conducted online through the claims website administered by the Claims Administrator. Any Class member unable to complete an online Claim Form may call a toll free number, provide their name and address, and receive a paper Claim Form. Paper Claim Forms may be mailed to the Claims Administrator and must be postmarked on or before the Claims Deadline. The paper Claim Form agreed to by the Parties is attached hereto as Exhibit 1. The Claims Administrator shall reject any claims not submitted in accordance with the above provided, however, that nothing in this provision shall be construed to prevent the Claims Administrator, in its discretion, from permitting a Settlement Class Member to remedy deficiencies in such Settlement Class Member's Claim Form.

**C.**     **Processing and Validation of Claims**

1.     *Claims Must be for Unauthorized Charges.*  All claims shall be validated by the Claims Administrator to establish that the Third Party Mobile Content charges associated with each claim were not authorized.

2.     *Claims Administrator Review.*  The Claims Administrator may reject a claim, or any part of a claim, where there is evidence of customer abuse or fraud or where indicia of authorization are present.  For example, the Claims Administrator may reject a claim or any portion of a claim if it appears that the Claimant has previously received multiple refunds for the same type of charge that is being requested for refund in the Claim Form, provided that such charges do not arise from a subscription cancelled by the Account Holder and not reactivated by an authorized user on the account.

3.     *Review for Indicia of Authorization.*  The Claims Administrator shall make the determination by a totality of the circumstances and shall have the right to request additional information.  To determine whether the charge was unauthorized, the Claims Administrator may review, *inter alia*, the Claimant's Third Party Mobile Content purchase history, including but not limited to the following:

(a)     whether a refund was previously issued for the charges associated with a claim;

(b)     whether refunds were previously given for other Third Party Mobile Content charges associated with the wireless number tied to a claim;

(c)     if refunds were previously given, the amount of the refunds given for the charges associated with the wireless number tied to a claim;

(d)     the number and frequency of similar Third Party Mobile Content charges associated

with the wireless number tied to a claim;

(e)     the amount of similar charges associated with the wireless number tied to a claim;

(f)     the existence of charges from a different wireless number on the same account tied to a claim;

(g)     the reputation of the source of the Third Party Mobile Content;

(h)     the nature and type of the Third Party Mobile Content;

(i)     the number of telephone lines associated with the account;

(j)     a comparison of the date the Third Party Mobile Content was ordered and the date the account was opened;

(k)     whether the charges were voluntarily paid; and

(k)     any explanation given by the Account Holder.

    4.     *Subscription Charges.* As provided in Section IV.B.2, the Settlement Benefit for any claim made for a recurring charge that was billed and paid for by the Claimant for more than three successive billing cycles shall be limited to three times the amount of such recurring charges appearing on a monthly basis. For example, if a Claimant requests refund for four months of a recurring monthly charge, the Claims Administrator may refund three months of the recurring charge but will reject the claim for refund of the fourth month of this charge.

    5.     *Previously Refunded Amounts.* The Claims Administrator shall not provide a Settlement Benefit for any charge associated with a claim that has been previously refunded by AT&T Mobility or a Third Party Provider.

**D.      Resolution Procedure For Challenged or Rejected Claims**

  **1.      *Abuse of Discretion by Claims Administrator.*** Both AT&T Mobility and

Plaintiffs' Counsel shall have the right to challenge systematic abuse(s) in processing or handling of

the claims as submitted by Settlement Class members and such challenges will be timely decided by

the Mediator. The Parties agree that the Claims Administrator shall thereafter follow the decision of

the Mediator resulting from any such challenge.

  **2.      *Challenging Individual Claims.***

   **a.**      AT&T Mobility may challenge any claim, and the Claim Form will

disclose the right of AT&T Mobility to challenge claims.

   **b.**      AT&T Mobility shall have thirty (30) days upon receiving notice of

such approval to dispute any claim for a Settlement Benefit approved by the Claims

Administrator. Any Settlement Class member whose claim for a Settlement Benefit is denied by

the Claims Administrator shall also have thirty (30) days upon receiving notice of such denial to

dispute the denial of the claim. In either case, each party shall receive written notice that the

denial/approval of the claim is being disputed and shall be provided an Appeal Form wherein the

appealing party must provide a detailed written explanation as to why the Claims Administrator

erred in its denial/approval of the claim for a Settlement Benefit.

   **c.**      All Appeal Forms will be submitted to an Appeal Panel that will be

comprised of three (3) members: one (1) member to be appointed by AT&T; one member (1) to

be appointed by the Claims Administrator; and one (1) member to be appointed by Plaintiffs'

Counsel. The Appeal Panel shall meet at regularly determined times to decide all appeals based

solely on the Appeal Forms submitted and AT&T records. There will be no in-person hearings

of any kind. In order to overrule the decision of the Claims Administrator to approve/deny a claim for a Settlement Benefit, the party submitting the appeal must garner two (2) votes from the Appeal Panel.

        d.    If the Appeal Panel affirms the decision of the Settlement Administrator, the losing party has a right to one final appeal to have the issue of the denial/approval determined by a Special Master, to be either jointly agreed to by the Parties, or, if no such agreement is reached, as selected by the Mediator. All decisions regarding the denial/approval of any claim submitted and ruled upon by the Special Master are final.

## VI.    SETTLEMENT PAYMENTS

        A.    AT&T Mobility shall be solely responsible to pay all Claims Administration Expenses, including but not limited to reasonable fees and costs for the Special Master, and all Notice Expenses for a Notice Plan as described in this Agreement, as well as the Fee Award approved by the Court to Class Counsel.

        B.    The Claims Administrator shall request funds from AT&T Mobility in amounts, from time to time, sufficient to timely pay: (i) the costs of administration of this Settlement; (ii) the attorneys' fees and costs awarded by the Court to Class Counsel; and (iii) all Approved Claims. The Claims Administrator shall, in its discretion, request funds periodically and from time to time only as necessary to make payments due under this Agreement.

        C.    AT&T Mobility will use its best efforts to pay an Approved Claim as soon as practicable following approval by the Claims Administrator, but in no event more than 90 days following such approval. The Claims Administrator shall pay all Approved Claims (not paid by AT&T Mobility via a bill credit) by check and mail them to the Claimant via first-class mail.

## VIII.  NOTICE TO THE CLASS

A.      Upon Preliminary Approval of this Agreement (and as the Court may direct), the Parties (or their designee) shall cause the Class Notice describing the Fairness Hearing and the terms of the Settlement embodied herein to be disseminated to potential Class Members as provided herein.  Notice shall comport with due process and be effectuated pursuant to a Notice Plan.

B.      The Notice Plan shall include:

1.      Publication Notice shall be made in a single publication each in USA TODAY WEEKEND and PARADE, to be published within ninety (90) days of receipt of Preliminary Approval of the Settlement.  The text of such notice is provided in Exhibit 2.

2.      A paper Bill Insert Notice shall be provided to current direct bill wireless Account Holders who receive bills by paper and an electronic Bill Insert Notice shall be provided to Account Holders who receive bills electronically.  The text of such notice is provided in Exhibit 3. Bill Insert Notice will be completed within one hundred and twenty (120) days after Preliminary Approval of the Settlement.

3.      Internet Publication Notice.  Immediately following Preliminary Approval of the Settlement, Website Notice shall be provided on the website to be administered by the Claims Administrator.  The text of such Notice is provided in Exhibit 4.

C.      The Class Notice shall advise Class Members of their rights, including the right to opt-out and/or comment or object upon the Settlement Agreement or its terms.  The Notice shall provide that any objection to the proposed Settlement Agreement, and any papers submitted in support of said objection, shall be received by the Court at the Fairness Hearing, only if, on or before a date approved by the Court and to be specified in the Class Notice, the Person making an objection

shall file notice of his or her intentions to do so and shall file copies of such papers he or she proposes to submit at the hearing with the Clerk of the Court and mail, hand or overnight delivery service to both Class Counsel and AT&T Mobility's Counsel on or before the date specified in the Class Notice.

     **D.**    The cost of the Notice, the Notice Plan as outlined herein, and the dissemination of the Notice shall be borne solely by AT&T Mobility.

## IX.    OPT-OUT AND OBJECTIONS

     **A.**    A Class Member may opt out of the Class at any time during the Opt-Out Period, as will be outlined in the Court-approved Notice. Opt-outs must be post-marked by a date approved by the Court and specified in the Notice. In order to exercise the right to opt out, the Class Member must complete and return a Request For Exclusion to the Claims Administrator during the Opt-Out Period. Except for those potential Class Members who have properly opted out, all Class Members will be deemed a Class Member for all purposes under this Agreement. Any potential Class Member who elects to opt out of the Class shall not (i) be bound by any orders or judgments entered in this Action; (ii) be entitled to relief under or be affected by this Agreement; (iii) gain any rights by virtue of this Agreement; or (iv) be entitled to object to any aspect of this Agreement. The Request For Exclusion must be personally signed by the Person requesting exclusion. So called "mass" or "class" opt-outs shall not be allowed.

     **B.**    Any Settlement Class Member who intends to object to the Settlement Agreement must include his/her name and address, include all arguments, citations, and evidence supporting the objection. An objecting Class Member must state, in writing, all objections and the basis for any such objection(s), and provide a statement whether the Objector intends to appear at the Fairness

Hearing, either with or without counsel. Objections must be post-marked by a date approved by the Court and specified in the Notice. Any Settlement Class Member who fails to timely file a written objection and notice of his or her intent to appear at the Fairness Hearing pursuant to this paragraph or as detailed in the Notice, shall not be permitted to object to the Class Settlement at the Fairness Hearing, and shall be foreclosed from seeking any review of the Class Settlement by appeal or other means.

## X.    AT&T MOBILITY'S RIGHT OF WITHDRAWAL

A.    If an excess of a reasonable amount of Class Members, in an amount to be agreed upon by the Parties and approved of by the Court prior to Notice being effectuated, timely file valid opt-out requests, AT&T Mobility shall have the right to terminate from this Agreement. AT&T Mobility shall exercise such withdrawal right, if at all, no later than ten (10) business days after being advised by the Claims Administrator in writing of the number of opt-out requests following the end of the Opt-Out Period. In the event AT&T Mobility exercise its right of termination, AT&T Mobility shall promptly notify Class Counsel and cause the Claims Administrator to notify the Class by posting information on the Settlement website and e-mailing information to those Class Members who provided an e-mail address to the Claims Administrator.

## XI.    EXCLUSIVE REMEDY; DISMISSAL OF ACTION; JURISDICTION OF COURT

A.    This Agreement shall be the sole and exclusive remedy for any and all Settled Claims of all Class Members against the Released Parties. No Released Party shall be subject to liability or expense of any kind to any Class Member with respect to any Settled Claim. Upon entry of the Judgment pursuant to the Fairness Hearing, each and every Class Member shall be permanently barred and enjoined from initiating, asserting and/or prosecuting any Settled Claim(s) against any

Released Party in any court or forum.

    B.    The Parties agree that the Court shall retain exclusive and continuing jurisdiction of the Action, Parties, Class Members and the Claims Administrator to interpret and enforce the terms, conditions, and obligations under this Agreement.

## XII.   RELEASES

    A.    Upon entry of the Judgment, each Settlement Class Member who has not validly opted out of the Settlement, shall be deemed to and does hereby release and forever discharge each Released Party of and from liability for any and all Settled Claims.

    B.    Upon entry of Judgment without further action, for good and valuable consideration, Plaintiff, on behalf of herself and the Settlement Class and as the representative of the Settlement Class, shall expressly, and all Settlement Class Members shall be deemed to have, and by operation of the final judgment contemplated by this Agreement shall have, fully, finally, and forever expressly waived and relinquished with respect to Settled Claims, to the fullest extent permitted by law, any and all provisions, rights, and benefits of section 1542 of the California Civil Code and any and all similar provisions, rights, and benefits conferred by any law of any state or territory of the United States or principle of common law that is similar, comparable, or equivalent to section 1542 of the California Civil Code, which provides: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

## XIII.   CLASS COUNSEL FEES AND COSTS AND INCENTIVE AWARDS

    A.    **The Fee Award.**  In addition to the consideration provided to the Claimants in Section IV, above, AT&T Mobility has agreed to pay Class Counsel, subject to Court approval, $4.3

Million (the "Maximum Fee Amount") in attorneys' fees and reimbursement of costs (the "Fee Award"). AT&T Mobility agrees that the Maximum Fee Amount is fair and reasonable and will not object to or otherwise challenge Class Counsel's application for reasonable attorneys' fees and for reimbursement of costs and other expenses if limited to the Maximum Fee Amount. Class Counsel has, in turn, agreed not to seek more than the Maximum Fee Amount from the Court.

     **B.**    **Payment of the Fee Award.** Notwithstanding any appeal or objection or challenge to the Settlement or to the Fee Award, provided Lead Class Counsel provides adequate security for the recovery of amounts paid in the event of reversal of the award of fees on appeal, AT&T Mobility shall pay (by wire) to Lead Counsel the Fee Award approved by the Court within thirty (30) days after entry of the order approving such award of fees or reimbursement of expenses. The adequacy of security shall be determined by AT&T Mobility in its sole discretion. Absent the provision of such security, AT&T Mobility shall pay the Fee Award to Lead Class Counsel by wire transfer within thirty (30) days of the Effective Date.

     **C.**    **Class Representatives' Incentive Award:** In addition to any award under the Settlement, and in recognition of their efforts on behalf of the Class, the Class Representatives shall, subject to Court approval, receive and award collectively of the sum of $10,000.00 as appropriate compensation for their time and effort serving as the Class Representative in this litigation. Such amount shall be paid by AT&T Mobility to Lead Class Counsel within twenty (20) days after the Effective Date.

## XIV.   SETTLEMENT APPROVAL ORDER

A.      This Agreement is subject to and conditioned upon the issuance by the Court of the Judgment which finally certifies the Settlement Class and grants final approval of this Agreement in accordance with applicable jurisprudence, and providing the relief specified below, which relief shall be subject to the terms and conditions of this Agreement and the Parties' performance of their continuing rights and obligations hereunder.  Such Judgment shall:

1.      Confirm the certification, for settlement purposes only, of the Settlement Class under applicable jurisprudence;

2.      Dismiss all complaints in the Action as with prejudice and without costs;

3.      Decree that neither the Judgment nor this Agreement constitute an admission by AT&T Mobility of any liability or wrongdoing whatsoever;

4.      Bar and enjoin all Class Members from asserting against any Released Party any and all Settled Claims which the Class member had, has, or may have in the future;

5.      Release each Released Party from the Settled Claims which any Class Members have, had, or may have in the future, against such Released Party;

6.      Determine that this Agreement is entered into in good faith, is reasonable, fair and adequate, in the best interest of the Class; and

7.      Preserve the Court's continuing and exclusive jurisdiction over the Parties to this Agreement, including AT&T Mobility and all Class Members, to administer, supervise, construe and enforce this Agreement in accordance with its terms for the mutual benefit of the Parties, but without affecting the

finality of the Judgment.

B.      In the event that the Court or any appellate court enters an order altering this Settlement Agreement in a way that materially and adversely affects AT&T Mobility or Plaintiff, within five (5) business days from the date the Court or appellate court enters such an order, AT&T Mobility or Plaintiff, as the case may be, may terminate this Settlement Agreement by giving written notice of its intent to do so to the opposing party's counsel.

## XV.     REPRESENTATIONS AND WARRANTIES

AT&T Mobility represents and warrants (i) that it has all requisite corporate power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby; (ii) that the execution, delivery and performance of this Agreement and the consummation by it of the actions contemplated herein have been duly authorized by all necessary corporate action on the part of AT&T Mobility; and (iii) that this Agreement has been duly and validly executed and delivered by AT&T Mobility and constitutes its legal, valid and binding obligation.

## XVI.    MISCELLANEOUS PROVISIONS

### A.      Entire Agreement

This Agreement, including all exhibits hereto, shall constitute the entire Agreement among the Parties with regard to the subject of this Agreement and shall supersede any previous agreements, representations, communications and understandings among the Parties with respect to the subject matter of this Agreement.  This Agreement may not be changed, modified, or amended except in writing signed by all Parties, subject to Court approval.  The Parties contemplate that, subject to Court approval, the exhibits to this Agreement may be modified by subsequent Agreement of AT&T

Mobility and Class Counsel prior to dissemination to the Class.

**B.     Governing Law**

This Agreement shall be construed under and governed by the laws of the State of Georgia, applied without regard to laws applicable to choice of law.

**C.     Execution by Counterparts**

This Agreement may be executed by the Parties in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Facsimile signatures or signatures sent by e-mail shall be treated as original signatures and shall be binding.

**D.     Confirmatory Discovery**

In addition to the discovery received and investigation conducted by Class Counsel, AT&T Mobility shall provide to Class Counsel reasonable additional discovery and information as necessary to confirm the material representations made by AT&T Mobility which form the basis of this Settlement, and the Parties shall cooperate in seeking any third-party discovery as may be necessary and appropriate, such additional discovery to be completed prior to the Fairness Hearing.

**E.     Notices**

Any notice, instruction, application for Court approval or application for Court orders sought in connection with this Agreement or other document to be given by any Party to any other Party shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, if to AT&T Mobility to the attention of AT&T Mobility's respective representatives and to Class Counsel on behalf of Class Members, or to other recipients as the Court may specify.

All notices to the Parties or counsel required by this Agreement, except Settlement Class

SETTLEMENT AGREEMENT

member opt outs and objections, shall be made in writing and communicated by fax and mail to the following addresses:

If to Plaintiff or Plaintiff's Counsel or Lead Counsel:

Jay Edelson, Esq.
KamberEdelson, LLC
53 West Jackson Boulevard, Suite 550
Chicago, Illinois 60604

If to AT&T Mobility or AT&T Mobility's Counsel:

Seamus C. Duffy
Drinker, Biddle and Reath LLP.
One Logan Square
Philadelphia, Pennsylvania 19103-6996

David L. Balser
McKenna, Long and Aldridge LLP
303 Peachtree Street, NE
Suite 5300
Atlanta, GA 30308

**F.     Dismissal**

Plaintiffs or Class Counsel in the affiliated Coordinated Actions shall, upon final approval of the settlement in this Action, obtain dismissal of their respective class action complaints.

**G.     Miscellaneous Provisions**

This Agreement shall be binding upon and inure to the benefit of the heirs, successors, assigns, executors and legal representatives of all parties to the Settlement.

Subject to Court approval, the Parties may agree to reasonable extensions of time to carry out any of the provisions of this Agreement.

The determination of the terms of, and the drafting of, this Agreement has been by mutual agreement after negotiation, with consideration by and participation of all Parties hereto and their

counsel.

The waiver by one Party of any provision or breach of this Agreement shall not be deemed a waiver of any other provision or breach of this Agreement.

## XVII.  TERMINATION OF THIS AGREEMENT

This Agreement shall, without notice, be automatically terminated if the Judgment is not entered, if the Judgment is reversed on appeal and the reversal becomes final, or in the event of AT&T Mobility's termination pursuant to this Agreement. Upon termination, all Parties shall be restored to their respective positions as immediately prior to the date of execution of this Settlement Agreement except as otherwise provided.

## XVIII. AUTHORITY TO SIGN

Any individual signing this Agreement on behalf of any Person represents and warrants that he or she has full authority to do so.

Facsimile signatures shall be considered valid signatures as of the date hereof, although the original signature pages shall thereafter be appended to this Agreement.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed on its behalf by its duly authorized counsel of record, all as of the day set forth below.

**AGREED:**

**PLAINTIFF AND PLAINTIFF'S IN THE COORDINATED ACTIONS, by their attorneys:**

**LEAD CLASS COUNSEL**

Dated: _May 26_, 2008        KAMBEREDELSON, LLC

Jay Edelson
53 W. Jackson Blvd., Suite 550
Chicago, IL 60604
Telephone: 312.589.6370
Facsimile: 312.913.9401

*On Behalf of Plaintiffs and the Class*

**LIAISON CLASS COUNSEL**

Dated: _____, 2008        BOONE & STONE LP

COORDINATED ACTION COUNSEL

Dated: _____, 2008          LOCKRIDGE GRINDAL NAUEN P.L.L.P

_____

Dated: _____, 2008          GISKAN, SOLOTAROFF, ANDERSON &
                                       STEWART LLP

_____

Dated: _____, 2008          THE JACOBS LAW FIRM, CHTD.

_____

AT&T MOBILITY LLC, by its attorneys:

Dated: _May 28_____, 2008          AT&T MOBILITY LLC

                                     By: _N l S. Rut_____
                                         Neal S. Berinhout

                        32 of 32
                     SETTLEMENT AGREEMENT

# EXHIBIT C

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

COPY
FILED IN OFFICE

MAY 3 0 2008

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

TRACIE MCFERREN, individually and on behalf     )
of a class of similarly situated individuals,         )
                                                                           )
                                        Plaintiff,          )          No. 2008-CV-151322
                                                                           )
v.                                                                        )          Business Court
                                                                           )
AT&T MOBILITY LLC,                                         )
                                                                           )
                                        Defendant.       )

---

### ORDER ON CLASS CERTIFICATION AND PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AGREEMENT

On May 30, 2008, counsel appeared before the Court by telephone to present.

argument on Plaintiff's Motion and Memorandum in Support of Preliminary Approval of

Class Action Settlement (the "Memorandum") in this nation-wide class action.  After

having reviewed the record of the case, the Memorandum, and the representations of

Counsel, the Court finds as follows:

       1.      This Court has personal jurisdiction over the proposed Settlement Class

and subject matter jurisdiction over this action.

       2.      The Court finds that the (a) the proposed settlement, the Class Action

Settlement Agreement listed as Exhibit A to the Memorandum (the "Proposed

Settlement") resulted from arm's length negotiations; (b) the Proposed Settlement is

within the range of possible recovery,  (c) the litigation of this case, if it did not settle,

would likely be complex, expensive, and lengthy; (d) the case is in its preliminary

litigation stages, but has benefited from the motions practice pursued in other similarly

situated class actions involving similar allegations; and (e) the amount and substance of

objections to the Proposed Settlement are not likely to be significant in light of the estimated size of the class and the terms of the settlement. Therefore, the Court finds that the Proposed Settlement warrants (i) preliminary certification of the settlement class (as set forth in Par 4 below); (ii) dissemination of notice to the class of the Proposed Settlement (as set forth in Par 11 below); and (iii) the scheduling of a hearing for final approval of the Proposed Settlement.

3.      The Court grants preliminary approval to the Proposed Settlement and finds that the requirements of O.C.G.A § 9-11-23 for maintenance of this action as a class action have been satisfied in all respects.

4.      Based on the stipulation of the Parties on the record that for the purposes of settlement, the Court finds that the class is so numerous that joinder is impracticable, there are questions of law and fact common to the class, the claims of the representative parties are typical of the claims of the class, the representative parties will fairly and adequately protect the interests of the class, and that the questions of law and fact common to the class predominate over individual questions making a class action the superior method for the adjudication of the controversy, the following persons are hereby certified as the class (the "Settlement Class"):

> All current and former AT&T Mobility Account Holders Nationwide who, at any time from January 1, 2004 to the Notice Date, were billed for Third Party Mobile Content. Excluded from the Class are the following: the Defendant, the Third Party Providers, the Claims Administrator, the Mediator, and any of their respective parent, subsidiary, affiliate or control person of the Defendant, as well as the officers, directors, agents,

servants, or employees of the Defendant, any trial judge presiding over this case over any of the actions which comprise the Action or Coordinated Actions, and the immediate family members of any such Person(s).

5.    The Court has reviewed the form, content, and manner of notice proposed by the Parties, including the publication notice and full notice proposed by the Parties, attached hereto as Exhibits A-C. The Court finds that the proposed form and content of the proposed notices and the manner of providing notice to the Settlement Class as outlined in the Settlement Agreement and the Parties' filings (which includes, inter alia, a combination of direct bill inserts, internet publication, notice by publication in national publications, and press releases for national news sources), is the best notice that is reasonably practicable under the circumstances, including, but not limited to, the size of the Settlement Class, to apprise such members: (i) of the pendency of this action; (ii) of their right to exclude themselves from the proposed settlement; (iii) that any member of the Settlement Class that does not exclude his or herself from the Proposed Settlement may object to the settlement; (iv) that any member of the Settlement Class may appear at the hearing on Final Approval of the Settlement; and (v) that any judgment will include all members of the Settlement Class who do not request exclusion from the Proposed Settlement.

6.    In light of the foregoing, the Court concludes that the terms of the proposed Settlement Agreement are fair, reasonable, and adequate so as to warrant this Court's preliminary approval of the Proposed Settlement and form of notice.

7.    The Court finds that Tracie McFerren, Morris Fiddler and Kristen Hensley will adequately represent the interests of the Settlement Class, and are hereby designated as class representatives for the Settlement Class.

8.    The Court finds that Class Counsel, who are experienced and competent, will fairly and adequately represent the Settlement Class and are hereby appointed to represent the Settlement Class:

Lead Class Counsel:
Jay Edelson
Myles McGuire
KamberEdelson, LLC
53 W. Jackson Blvd., Ste. 1530
Chicago, IL 60604

Scott A. Kamber
KamberEdelson, LLC
11 Broadway, 22nd Floor
New York, NY 10004

Liaison Counsel:
David W. Boone
William S. Stone
Aileen Page
Boone & Stone
3166 Mathieson Dr.
Atlanta, GA 30305

9.    In addition a Plaintiffs' Steering Committee is hereby appointed as follows:

Plaintiffs' Steering Committee:
Robert Shelquist (Chairman)
Lockridge Grindal Nauen,.L.L.P.
100 Washington Avenue
Suite 2200
South Minneapolis, MN 55401

Oren Giskan
Giskan, Solotaroff, Anderson & Stewart, LLP,
11 Broadway, Suite 2150
New York, NY 10004

David Healey
Law Offices of David P. Healey, PL
2846-B Remington Green Cr.
Tallahassee, FL 32308

John G. Jacobs
The Jacobs Law Firm, Chtd.
122 S Michigan Ave
Suite 1850
Chicago, IL 60603

10.    Subject to the conditions of the Settlement Agreement, Rust Consulting is

appointed to act as Claims Administrator.

11.    Defendant will cause notice in the forms attached hereto as Exhibits A-C respectively to be disseminated upon entry of this Order as follows: (i) to be posted on the Internet at www.ThirdPartyContentRefund.com within three (3) days of this Order; (ii) by publication in USA TODAY WEEKEND and PARADE by August 28, 2008; and (iii) directly by mail to all current customers with their next billing statement by September 27, 2008.

12.    Any request to be excluded from the Settlement Class (*i.e.*, opt out) must be mailed on or before November 3, 2008, to the Claims Administrator at its designated address.

13.    Any objections or comments to the proposed Settlement Agreement must be mailed on or before November 3, 2008, to the Claims Administrator at its designated address and file a copy with the Clerk of the Court at:

Clerk of the Court
Superior Court of Fulton County
136 Pryor Street S.W., Room C-155
Atlanta, GA 30303

14.    A final approval hearing will be held on **December 8, 2008, at 10:00 a.m. in Courtroom 9J**, located at 136 Pryor Street, SW, Atlanta, GA 30303.  At that time, the Court will determine: (i) whether this action shall be finally certified as a class action for settlement purposes; (ii) whether the settlement should be finally approved as fair, reasonable, and adequate; (iii) whether this action should be dismissed with prejudice under the terms of the Settlement Agreement; (iv) whether members of the Settlement Class are bound by the Release in the Settlement Agreement; and (v) whether the Application of Plaintiffs' Counsel for an award of attorneys' fees and expenses should

*J:\McFerren\ORDER__Preliminary Approval of Settlement and Class Certification.doc*

5

be approved.  The parties' memoranda in support of the Proposed Settlement must be filed with the Court on or before November 17, 2008.

15.    Any member of the Settlement Class who wishes to receive a Settlement Benefit under the Proposed Settlement must submit a timely claim form. Claim Forms must be received by the Claims Administrator on or before ninety (90) days after the entry of Final Judgment.

**SO ORDERED** this 30th day of May, 2008.

_____
ALICE D. BONNER, SENIOR JUDGE
Superior Court of Fulton County
Atlanta Judicial Circuit

**COPIES SENT TO:**

**Lead Class Counsel:**
Jay Edelson
Myles McGuire
KamberEdelson, LLC
53 W. Jackson Blvd., Ste. 1530
Chicago, IL 60604

Scott A. Kamber
KamberEdelson, LLC
11 Broadway, 22nd Floor
New York, NY 10004

**Liaison Counsel:**
David W. Boone
William S. Stone
Aileen Page
Boone & Stone
3166 Mathieson Dr.
Atlanta, GA 30305

**Plaintiffs' Steering Committee:**
Robert Shelquist (Chairman)
Lockridge Grindal Nauen, P.L.L.P.
100 Washington Avenue
Suite 2200
South Minneapolis, MN 55401

Oren Giskan
Giskan, Solotaroff, Anderson & Stewart, LLP,
11 Broadway, Suite 2150
New York, NY 10004

David Healey
Law Offices of David P. Healey, PL
2846-B Remington Green Cr.
Tallahassee, Florida 32308

John G. Jacobs
The Jacobs Law Firm, Chtd.
122 S Michigan Ave
Suite 1850
Chicago, IL 60603

**Counsel for Defendant:**
David L. Balser, Esq.
McKenna Long & Aldridge LLP
303 Peachtree ST. NE, Suite 5300
Atlanta, Georgia 30308
(404) 527-4170
(404)527-4198 (fax)
dbalser@mckennalong.com

# Exhibit A

NOTICE OF PENDENCY OF CLASS ACTION SETTLEMENT

**IN THE SUPERIOR COURT OF FULTON COUNTY- STATE OF GEORGIA**
*Tracie McFerren v. AT&T Mobility LLC,* Case No. _____

>> **Click Here to Make a Claim**<<
>>**Click Here to Download a Paper Claim Form**<<
(You must submit a claim form by _____)
>>**Click Here to Download a Copy of the Settlement Agreement**<<

**IF YOU WERE BILLED FOR THIRD PARTY MOBILE CONTENT ON
YOUR
AT&T MOBILITY ACCOUNT FROM JANUARY 1, 2004 TO _____**

IMPORTANT

PLEASE READ THIS NOTICE CAREFULLY
THIS NOTICE RELATES TO THE PENDENCY OF CLASS ACTION LITIGATION
AND IF YOU ARE A CLASS MEMBER CONTAINS
IMPORTANT INFORMATION ABOUT YOUR RIGHTS TO MAKE A CLAIM UNDER THE
SETTLEMENT OR TO OBJECT TO THE SETTLEMENT

The Superior Court of Fulton County, State of Georgia authorized this notice. This is not a solicitation from a lawyer.

**What Is This?** This notice is to inform you of the proposed Settlement of a lawsuit pending in Georgia. The Court has granted preliminary approval of the settlement and has certified the Settlement Class defined above, subject to a fairness hearing which will take place on [date] at [time] in Courtroom [number], [Court name] to determine if the proposed Settlement is fair, reasonable and adequate and to consider the request for attorneys' fees and expenses.

Similar lawsuits were filed and are pending in state and federal courts in California, Illinois, Minnesota, and New York. These lawsuits relate to the sale, marketing and billing of third party mobile content to AT&T Mobility LLC ("AT&T" or "AT&T Mobility") wireless telephone subscribers.

This notice explains the nature of the lawsuit and the terms of the settlement and informs you of your legal rights and obligations.

By settling this lawsuit, AT&T Mobility is not admitting that it is liable to the Settlement Class.

You have options, explained below.

**What is Third Party Mobile Content?** Third party mobile content is a product (such as ringtones, games, graphics and news or other alerts) that may be purchased and downloaded to your wireless device and is advertised, marketed and sold directly by a third party content

provider/merchant other than AT&T Mobility. Third party mobile content is not advertised, marketed or directly sold by AT&T Mobility.

**Who is in the Settlement Class?** You are a member of the Settlement Class and your rights are affected if you are a person (or entity) in the United States or its Territories with an AT&T Mobility account, and who was billed for third party mobile content from January 1, 2004 to [date] and were not previously refunded for this charge.

**What is the Litigation About?** Plaintiffs filed a class action in the Superior Court of Fulton County, Georgia, on behalf of a proposed class, alleging that AT&T Mobility charged its wireless subscribers for third party mobile content that was not authorized. Similar lawsuits were filed and are pending in state and federal courts throughout the county, including in California, Illinois, Minnesota, New York and other states. These class actions likewise allege that AT&T Mobility charged its subscribers for third party mobile content that was not authorized. You need not live in any of these States to receive a benefit under the proposed settlement. The Georgia class action asserts claims for breach of contract and violation of state consumer protection statutes and seeks monetary and injunctive relief. To resolve this matter without the expense and uncertainties of litigation in several class actions, the Parties have reached a proposed settlement. The settlement requires AT&T Mobility to implement certain service improvements, assurances, and monetary relief under specific circumstances. This settlement is not an admission of wrongdoing by any party.

**What Relief is Provided To Class Members Under The Settlement?**

A.      **Relief for All Settlement Class Members – AT&T Mobility Service Improvements & Assurances.** AT&T Mobility has agreed to provide disclosures regarding mobile content in its Wireless Customer Service Agreement and on its website. In addition, AT&T Mobility will provide a telephone number and website address in all bills for customers who seek to dispute a charge. AT&T Mobility has further agreed to provide and enhance as necessary the means for its customers to freely address billing inquiries related to Third Party Mobile Content.

B.      **Relief for Settlement Class Members Filing Claims.** In addition to the above-described service improvements, all Settlement Class members are entitled to individual relief with respect to the Settlement. AT&T Mobility has agreed to refund the amount of all eligible third party mobile content charges that were billed from January 1, 2004 to [date], and subject to the limitations concerning subscriptions that follow. These refunds will be provided to the Settlement Class members as follows:

1.      *Refunds.* AT&T Mobility shall credit or refund to any former or current account holder all unauthorized charges for third party mobile content from January 1, 2004 to [date]. The refund can come in one of two forms: (1) a credit on your AT&T Mobility bill; or (b) a cash payment via first-class mail. In order to obtain this relief you must properly submit either an on-line or paper claim form by [date] and follow the instructions contained on the respective form and contained in this notice.

   2.    *Subscription Charge Refund.*  AT&T Mobility shall refund to any former or
   current account holder up to three times the monthly subscription amount if the charge
   was recurring on a monthly or other basis based on a subscription or similar arrangement
   from January 1, 2004 to [date].  The refund can come in one of two forms: (1) a credit
   on your AT&T Mobility bill; or (b) a cash payment via first-class mail.  In order to obtain
   this relief you must properly submit either an on-line or paper claim form by [date] and
   follow the instructions contained on the respective form and contained in this notice.

To be eligible for any refund, the charges must have been unauthorized and not previously
refunded to your account.

**What are my Legal Rights?**

*How Do I File A Claim for a Refund or Subscription Charge Refund?*
If you were billed for unauthorized third party mobile content on your AT&T Mobility account
from January 1, 2004 until [date], you may submit a claim to obtain the "refunds" and/or
the "subscription charge refund" described above.  To receive any refund you must properly
submit an on-line claim form by going to www.ThirdPartyContentRefund.com.  If you do not
have access to the internet, you may obtain a claim form by downloading [insert link] and
printing it out or by calling the toll-free number and requesting a copy from the Claims
Administrator.  You must then mail a completed paper claim form to the Claims Administrator.
**Either the on-line form must be submitted or the paper form must be postmarked by
[INSERT DATE] or your claim will be rejected.**  Follow the steps below to make claim for a
Refund or Subscription Claim Refund.

   **Step 1 – Identify Unauthorized Third party Mobile Content Billed and Paid for By
   You.** Identify third party mobile content charges that were billed by AT&T Mobility
   from January 1, 2004 to [date].  This information is located on your AT&T Mobility
   wireless bill.  The claim form will ask you to specifically identify the third party mobile
   content charges that you seek to have refunded.

   **Step 2 – Complete a Claim Form.**  You must complete all information requested in the
   claim form and verify that the charges are unauthorized as well as the accuracy of the
   information provided in the claim form.  Claim forms that are incomplete or are not
   signed will be rejected.

   **Step 3 – Submit On-Line Form or Mail Paper Form to Claims Administrator.**
   Submit the completed on-line claim form following the instructions for submission or
   mail the completed claim form to the claims administrator.

*What Happens After a Claim Form is Filed?*
Upon receipt, the Claims Administrator will review your claim form and determine whether you
have eligible charges and are a member of the Settlement Class.  If your claim is approved, the
Claims Administrator will mail you a cash refund check via first-class mail or instruct AT&T
Mobility to credit the proper amount to your account.  You will then be bound by all orders and
judgments of the Court and your claims against AT&T Mobility and other entities, including

-3-

VeriSign, Inc., M-Qube, Inc., Jamster International SARL, and Mblox, Inc., for the conduct alleged in these actions will be resolved and released. If your claim is rejected by the Claims Administrator or challenged by AT&T Mobility, you will be notified of the reasons for the denial or challenge. If your initial claim is denied, you will be given the opportunity to appeal this decision. A full explanation of this process is set out in the Settlement Agreement.

The Claims Administrator may consider numerous factors in its review of your claim, which are fully set out in the Settlement Agreement.

*How Not to Participate in the Settlement Class*
If you do not wish to be a member of the Settlement Class, you may exclude yourself by writing to the Claims Administrator. You must provide your full name and address, state that you want to opt out of the AT&T Mobility settlement, and deliver your request by mail, hand, or overnight delivery service to the Claims Administrator, at [address]. Your request *must* be postmarked no later than [date].

*How Do I Object to the Settlement?*
The Court will hold a Fairness Hearing to determine if the proposed Settlement is fair, reasonable and adequate and to consider a motion for attorneys' fees and expenses on [date] at [time] in Courtroom [number], [Court name]. If you remain a member of the Settlement class you or your counsel have the right to appear before the Court and object to the Settlement. However, you must file a Notice of Intention to Appear and Object. All objections *must* be filed by [date]. You must (1) provide your full name and address; (2) include all arguments, citations, and evidence supporting your objection; (3) specify who, if anyone, will attend the hearing to speak for your objection; (4) deliver your objection by mail, hand, or overnight delivery service to the Claims Administrator to the address listed above; and (5) file a copy of your objection with the Clerk of Court.

**If I Remain in the Settlement Class, Who Represents Me?**
The Court has approved the following team of attorneys to represent the Settlement Class. They are called "Class Counsel." You will not be charged for these lawyers. If you want to be represented by your own lawyer, you may hire one at your own expense.

**Lead Class Counsel:**

| | |
|---|---|
| Jay Edelson | Scott A. Kamber |
| Myles McGuire | KamberEdelson LLC |
| KamberEdelsonLLC | 11 Broadway, 22nd Fl |
| 53 W. Jackson Blvd. | New York, NY 10004 |
| Suite 550 | Tel: [toll free number] |
| Chicago, IL 60604 | |
| Tel: [toll free number] | |

**Liaison Counsel:**
David W. Boone
William S. Stone
Aileen Page

- 4 -

Boone & Stone
3166 Mathieson Dr.
Atlanta, GA 30305

**Plaintiff's Steering Committee:**
Robert Shelquist (Chairman)
Lockridge Grindal Nauen PLLP
100 Washington Avenue, Suite 2200
South Minneapolis, MN 55401-2197

Orin Giskan
Giskan, Solotaroff, Anderson & Stewart
11 Broadway, Suite 2150
New York, NY 10004

David Healey
Law Offices of David P. Healey
2846-B Remington Green Cir
Tallahassee, FL 32308

John G. Jacobs
The Jacobs Law Firm, Chtd.
122 South Michigan Ave., Suite 1850
Chicago, IL 60603

**What is the Plaintiff's Attorneys' Fees Award?**
The Court has appointed a team of 10 attorneys involved in 16 related class actions to represent the Plaintiffs ("Class Counsel") against AT&T Mobility and/or other entities including VeriSign, Inc., M-Qube, Inc.; Jamster International SARL, and Mblox, Inc., and will request approval of the Court for attorney's fees and costs of up to $4.3 Million. If approved by the Court, this amount will be paid directly by AT&T Mobility to Class Counsel and will not reduce any benefit to you from the settlement.

**What is the Award To Class Representatives?**
The Court has appointed Tracie McFerren, Morris Fiddler and Kristen Hensley as Class Representatives, who along with additional named Plaintiffs in the related cases, will share $10,000 for their service as class representatives. If approved by the Court, this amount will be paid directly by AT&T Mobility to the Class Representatives and will not reduce the benefit to you from the settlement.

**Who Is Paying the Costs Associated with the Settlement?**
Costs associated with the notice and administration of this settlement will be paid by AT&T Mobility.

**What Claims Are Being Released in this Settlement?**
Unless you exclude yourself from the settlement, you will be part of the Settlement Class. By

- 5 -

staying in the Settlement Class, all of the Court's orders will apply to you, and you will give AT&T Mobility, VeriSign, Inc, M-Qube, Inc., Jamster International SARL, and Mblox, Inc. and all of their affiliated companies and their predecessors and successors (the "Released Parties"), a "release" for certain claims arising from or relating to the unauthorized mobile content which you have been billed for from the beginning of time until the Effective Date of the Settlement Agreement. A release means you cannot sue or be part of any other lawsuit against the Released Parties about the claims or issues in this Lawsuit ever again. To read the full release, see the Settlement Agreement.

**What Is Class Counsel's Opinion Of The Settlement?**
As part of this litigation, the Court approved and appointed Class Counsel who have conducted investigation into the factual and legal claims of the Settlement Class members and the defenses that might be asserted against those claims. Class counsel completed a five-day mediation before Rodney Max, Esquire, of the Upchurch Watson White & Max Mediation Group, who in his capacity as neutral mediator expressed his views about the case and the settlement. Based on their investigation and this process, Class Counsel believe that the settlement is fair, reasonable and adequate and in the best interests of the Settlement Class. Class Counsel and Plaintiff also recognize the expense and length of continued proceedings necessary to continue to prosecute this case through verdict, judgment and appeals and have taken into account the uncertainty and the risk of the outcome of continued litigation, especially in complex actions such as these as well as the difficulties and delays inherent in such actions.

**When Will the Court Determine the Fairness of the Settlement?**
A hearing will be held on the fairness of the proposed settlement. At the hearing, the Court will be available to hear any objections and arguments concerning the fairness of the proposed settlement, including the amount of the award to Plaintiffs' counsel for costs and attorney's fees. The Court will hold the Fairness Hearing on [date] at [time] in Courtroom [number], [Court name]. YOU ARE NOT OBLIGATED TO ATTEND THIS HEARING UNLESS YOU PLAN TO OBJECT TO THE SETTLEMENT.

If the settlement is not approved, the case will proceed as if no settlement had been attempted. There can be no assurance that if the settlement is not approved, the Settlement Class will recover more than is provided in the settlement, or indeed, anything.

**May I Contact AT&T Mobility Directly?**
Class Members are always able to call customer service to discuss third party mobile content charges made to their accounts. Calling customer service will not prohibit a Class Member from participating in the claims process.

**Where Can I Obtain More Information?**
Any questions you or your attorney may have concerning this notice should be directed to Class Counsel at the address listed above, or you can contact the Claims Administrator at [address, 1-877-465-4797, email]. Please include the case name and number, and your name and your current return address on any letters, not just the envelopes. You may also contact Lead Class Counsel at [toll free number]. You may also read the Settlement Agreement by downloading it from this site or by requesting a copy from the Claims Administrator.

**Please do not contact the Court Clerk or the Defendant's Attorneys as they are not in a position to give you any advice about this settlement.**

By Order of the Court Dated: May 30, 2008
SUPERIOR COURT OF FULTON COUNTY,
STATE OF GEORGIA

# Exhibit B

**If You Were Billed for Third Party Mobile Content (such as Ringtones, Games, Graphics, News and Other Alerts) on Your AT&T Mobility Account from January 1, 2004 to _____, You May Receive a Credit or Refund From a Class Action Lawsuit. Please Read This Legal Notice.**

*Para Una Notificacioin en Espanol, Llamar or Visitar Nuestro Website*

## NOTICE OF CLASS ACTION AND PROPOSED SETTLEMENT

This notice is to inform you of the proposed Settlement of several similar lawsuits. These lawsuits relate to the sale, marketing and billing of third party mobile content such as ring tones and news alerts to AT&T Mobility wireless telephone subscribers.

This notice is a summary only. You should read the Full Notice for complete information. You can get a copy of the Full Notice by visiting the Web site, calling the toll-free number listed, or writing to the address listed below.

**What is Third Party Mobile Content?**
Third party mobile content is a product (such as ringtones, games, graphics and news or other alerts) that may be purchased and downloaded to your wireless device and is advertised, marketed and sold directly by a third party content provider/merchant other than AT&T Mobility. Third party mobile content is not advertised, marketed or directly sold by AT&T Mobility LLC ("AT&T Mobility").

**Who Is Involved?**
You are a member of the Settlement Class and your rights are affected if you are a person (or entity) in the United States or its Territories with an AT&T Mobility (previously known as Cingular Wireless) account who was billed for third party mobile content from January 1, 2004 to [date] and were not previously refunded for this charge.

**What is the Case About?**
Plaintiffs claim that Defendants charged AT&T Mobility subscribers for third party mobile content that was not authorized. AT&T Mobility denies these claims but are settling to avoid the burden and cost of continuing the case.

**What are the Terms of the Settlement?**
AT&T Mobility has agreed to refund the amount of all eligible third party mobile content charges that were billed for between January 1, 2004 to [date]. If the charge was recurring on a monthly or other basis based on a subscription or similar arrangement, you may only recover up to three times the amount of any such monthly charge. To be eligible for any refund, the charges must have been unauthorized and not previously refunded to your account. AT&T has also agreed to take steps to inform its customers about mobile content, the ability to restrict its purchase through parental controls, and methods for its customers to dispute unauthorized charges and cancel mobile content subscriptions. The settlement is not an admission of wrongdoing by any party.

**Who Represents Me?**
The Court has appointed a team of 10 attorneys ("Class Counsel") to represent you for 16 related cases against AT&T and/or other entities. As part of the settlement, Class Counsel will request an award of attorneys' fees and expenses not to exceed $4,300,000 payable by AT&T Mobility. No award of fees or expenses will reduce the benefit to any Class Member. The Court has also appointed three Class Representatives who will share an award of $10,000 for their services. You may hire your own lawyer, but at your own expense.

**What are my Legal Rights?**
• *Stay in the Settlement Class:* You do not have to do anything to stay in the Class, but you must submit a Claim Form to receive a credit or refund. You may also object to the proposed Settlement.
• *Submit a Claim Form for a credit/refund:* If you wish to file a claim, you must complete a Claim Form. Claim Forms *must* be postmarked by [date]. The Claims Administrator will review your Claim Form and determine whether you have eligible charges and are therefore a member of the Settlement Class.
• *Object to the proposed Settlement:* You or your lawyer have the right to appear before the Court and object to the proposed Settlement. Your written objection must be postmarked by [date].
• *Exclude Yourself from the Settlement Class:* If you do not wish to be a member of the Settlement Class, you may exclude yourself by writing to the Claims Administrator. Your request *must* be postmarked by [date].

If you remain in the Settlement Class and the Court approves the proposed Settlement, you will receive the benefits of the proposed Settlement. You will also be bound by all orders and judgments of the Court and your claims against AT&T Mobility and other entities, including VeriSign, Inc., M-Qube, Inc., Jamster International SARL, and Mblox, Inc., for the conduct at issue in these cases will be resolved and released.

**When will the Court Consider the Proposed Settlement?**
The Court will hold a Fairness Hearing to determine if the proposed Settlement is fair, reasonable and adequate and to consider a motion for attorneys' fees and expenses on [date] at [time] in Courtroom [number], [Court name]. If comments or objections have been received, the Court will consider them at this time.

For more information about the proposed Settlement and a copy of the Full Notice and Claim Form, visit: www.ThirdPartyContentRefund.com, call: 1-877-465-4797, write to: Claims Administrator [address] or contact Lead Class Counsel: Jay Edelson, Scott A. Kamber, & Myles McGuire, KamberEdelson, LLC, 53 W. Jackson, Ste. 550, Chicago, IL 60604 [toll free number]

By Order of the Court Dated: May 30, 2008

SUPERIOR COURT OF FULTON COUNTY, GEORGIA

Ex. C. page 17 of 19

# Exhibit C

**Attention Customers:**
## You may be eligible to receive a credit or refund for unauthorized mobile content charges.
### Please read this legal notice.
*Para Una Notificacioin en Espanol, Llamar o Visitar Nuestro Website*

**What is this notice about?**
Certain AT&T/Cingular customers are eligible to obtain refunds for unauthorized purchases of third party mobile content, such as ringtones, graphics, games and news or other alerts ("Mobile Content") because of a proposed Settlement of a class action lawsuit. This notice is just a summary. You should read the Full Notice for complete information. You can get a copy of the Full Notice by visiting the Web site, calling the toll-free number or writing to the address listed below.

**What is the case about?**
Plaintiffs claim that Defendants charged AT&T Mobility subscribers for third party mobile content that was not authorized. AT&T Mobility, which was formerly known as Cingular, has entered into a proposed settlement agreement in a class action lawsuit about the marketing, advertising and billing practices of certain third party mobile content providers. AT&T Mobility denies these claims but are settling to avoid the burden and cost of continuing the case.

**What will I get?**
As part of the agreement, AT&T Mobility is offering to provide account holders with credits or refunds for unauthorized mobile content purchases made from January 1, 2004 to [date] that have not been previously refunded. AT&T has also agreed to take steps to inform its customers about mobile content, the ability to restrict its purchase through parental controls, and methods for its customers to dispute unauthorized charges and cancel mobile content subscriptions. The settlement is not an admission of wrongdoing by any party.

**How do I know if I am eligible for a credit or refund?**
If AT&T/Cingular has billed your account for the purchase of a third party mobile content that you did not authorize, you may be entitled to receive a refund for these charges. If a charge was recurring on a monthly or other basis based on a subscription or similar arrangement, you may only recover up to three times the amount of the recurring charge as to this type of charge.

**Who represents me?**
The Court has appointed a team of 10 attorneys ("Class Counsel") to represent you for 16 related cases against AT&T and/or other entities. As part of the settlement, Class Counsel will request an award of attorneys' fees and expenses not to exceed $4,300,000 payable by AT&T Mobility. No award of fees or expenses will reduce the benefit to any Class Member. The Court has also appointed three Class Representatives who will share an award of $10,000 for their services. You may retain your own counsel, but only at your own expense.

**What are my Legal Rights?**
• *Stay in the Settlement Class:* You do not have to do anything to stay in the Class, but you must submit a Claim Form to receive a credit or refund. You may also object to the proposed Settlement.
• *Submit a Claim Form for a credit/refund:* If you wish to file a claim, you must complete a Claim Form. Claim Forms *must* be postmarked by [date]. The Claims Administrator will review your Claim Form and determine whether you have eligible charges and are therefore a member of the Settlement Class.
• *Object to the proposed Settlement:* You or your lawyer have the right to appear before the Court and object to the proposed Settlement. Your written objection must be postmarked by [date].
• *Exclude Yourself from the Settlement Class:* If you do not wish to be a member of the Settlement Class, you may exclude yourself by writing to the Claims Administrator. Your request *must* be postmarked by [date].

If you remain in the Settlement Class and the Court approves the proposed Settlement, you will receive the benefits of the proposed Settlement. You will also be bound by all orders and judgments of the Court and your claims against AT&T Mobility and other entities, including VeriSign, Inc., M-Qube, Inc., Jamster International SARL, and Mblox, Inc., for the conduct at issue in these cases will be resolved and released.

**When will the Court Consider the Proposed Settlement?**
The Court will hold a Fairness Hearing to determine if the proposed Settlement is fair, reasonable and adequate and to consider a motion for attorneys' fees and expenses on [date] at [time] in Courtroom [number], [Court name]. If comments or objections have been received, the Court will consider them at this time.

For more information about the proposed Settlement and a copy of the Full Notice and Claim Form, visit: www.ThirdPartyContentRefund.com, call: 1-877-465-4797, write to: Claims Administrator [address] or contact Lead Class Counsel: Jay Edelson, Scott A. Kamber, & Mylos McGuire, KamberEdelson, LLC, 53 W. Jackson, Ste. 550, Chicago, IL 60604 (toll free number)

By Order of the Court Dated: May 30, 2008

SUPERIOR COURT OF FULTON COUNTY, GEORGIA

# EXHIBIT D

1  William M. Audet (CA 117456)
   waudet@audetlaw.com
2  Adel A. Nadji (CA 232599)
   anadji@audetlaw.com
3  AUDET & PARTNERS, LLP
   221 Main Street, Suite 1460
4  San Francisco, California 94105
   Tel: 415-568-2555
5  Fax: 415-568-2556

6  *Counsel for Plaintiffs*

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10

11

12  BABAK PISHVAEE, individually, and on
    behalf of a class of similarly situated
13  individuals                                No. 07-3407 (PVT)

14                          Plaintiff,         **FIRST AMENDED COMPLAINT FOR
                                               DAMAGES AND DECLARATORY AND
15              v.                             INJUNCTIVE RELIEF**

16  VeriSign, Inc., a California corporation,  DEMAND FOR JURY TRIAL
    m-Qube, Inc., a Delaware corporation, and
17  AT&T Mobility LLC, formerly known as       CLASS ACTION
    Cingular Wireless LLC, a Delaware
18  corporation

19                          Defendants.

20

21

22

23

24

25

26

27

28

                                1

**NATURE OF THE CLASS ACTION**

1.      Plaintiff Babak Pishvaee ("Plaintiff"), on behalf of himself and a class of similarly situated individuals ("Class"), brings this class action against VeriSign, Inc. and m-Qube, Inc. (collectively hereinafter "m-Qube"), and against AT&T Mobility LLC f/k/a Cingular Wireless LLC (hereinafter "Cingular"), seeking (1) to stop Defendants' common and unlawful practice of causing cellular telephone customers to be improperly billed for wireless content services that the customers did not order and (2) stop Defendants' common and unlawful practice of re-using cellular telephone numbers that are encumbered with undisclosed pre-existing billing obligations, which the practice thereof resulted in unauthorized charges to customers' accounts.

2.      M-Qube and Cingular shared in the revenues generated from the improper billing services, has profited enormously from its wrongful conduct in violation of (a) the common law of unjust enrichment, (b) improper billing in violation of federal and state statutes (against Cingular Defendant only), (c) violation of Civil Code §§ 1750, *et seq.*, and (d) violation of Bus. & Prof. Code Sections 17200 and 17500, *et seq.*

3.      Plaintiff seeks money damages disgorgement, injunctive and declaratory relief, costs, and reasonable attorneys' fees for himself and for the Class.

**PARTIES**

4.      Plaintiff is a resident of California and a member of the Class.

5.      Defendant m-Qube, Inc. is a leading mobile channel enabler that helps companies develop, deliver, and bill for mobile content, messaging and applications. Defendant m-Qube, Inc. is a Delaware corporation, and now a subsidiary of Defendant VeriSign, Inc.

6.      Defendant VeriSign, Inc. is a California corporation with headquarters in Mountain View, California. In May of 2006, VeriSign, Inc. acquired m-Qube, Inc. and became its corporate partner.

7.      Defendant AT&T Mobility LLC, f/k/a Cingular Wireless LLC, is a Delaware corporation with its principle place of business in Atlanta, Georgia. Cingular is a wholly-owned wireless subsidiary of AT&T Inc.

2

**JURISDICTION AND VENUE**

8.    The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because (a) at least one member of the putative class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under that subsection applies to the instant action.

9.    Venue is proper in this district under 28 U.S.C. §§ 1391(a)(1) and 1391(a)(2).

**STATEMENT OF THE FACTS**

10.    Cingular provides its customers with a cellular telephone number upon purchasing Cingular's cellular telephone services and/or activation of cellular telephone accounts. These telephone numbers are routinely "recycled" and "dirty." The term "recycled" means that that they were previously owned and/or used by other persons or entities. The term "dirty" means that they are encumbered with undisclosed pre-existing billing obligations for products and services purportedly authorized to be purchased by the previous owners and/or users of those numbers.

11.    Cingular's practice of re-issuing "dirty" phone numbers has resulted in unauthorized charges being placed on unsuspecting customers' telephone bills, such as Plaintiff, in an illegal practice known as "cramming." For years, Cingular has systematically, repeatedly and without authorization, placed charges on customers' monthly bills for third-party service that were never authorized to be purchased by the current owners of affected phone numbers.

12.    Third-party services include services such as ringtones, texts, news, and games. Cingular, like most content providers, uses a "intermediary" service company for billing customers for these third-party services. Here, Cingular used m-Qube Defendant's services. Defendant m-Qube is a leading "mobile channel enabler," allowing companies develop, deliver, and bill for mobile software such as ringtones, texts, news, and games to compatible mobile devices throughout the State of California and the nation.

13.    Mobile content providers, i.e., third party service companies, charge for their services and cause such charges to be placed directly on customers' cell phone bill accounts through Plaintiff's service carrier, Cingular. Content providers often turn to intermediaries such as m-Qube Defendants who maintain direct connections to the carriers' networks for content delivery

3

1  and handle the content providers' billing arrangements with the carriers. M-Qube has developed a

2  vast distribution system that integrates into the networks of the nation's largest cellular telephone

3  carriers, with direct connections to more than two-dozen carriers, including Cingular. As a result,

4  Defendants is able to deliver and bill for mobile content for more than 200 million wireless

5  subscribers nationwide. In this manner, m-Qube and Cingular Defendants have improperly

6  collected millions of dollars for improper billings for services not requested.

7      14.    As m-Qube knows, Cingular routinely recycles encumbered telephone numbers to

8  their customers when they sign up for new cell phone service. M-Qube generates its revenue is

9  primarily by transactions for which it, in concert with mobile content providers and Cingular,

10  charges cell phone subscribers. Each time one of its content-provider partners issues a charge for

11  its services. Defendants m-Qube and Cingular causes the charge to be billed by the carrier to the

12  cell phone account then associated with that phone number. Cell phones accounts function similar

13  to credit card accounts without any security features. The only information mobile-content

14  providers require in order to add a charge to a cell phone account is the cell phone number itself.

15      15.    These problems are reflected by scores of detailed, angry, and explicit online user

16  reviews of the Cingular and m-Qube services. Examples of such reviews follow:

17      "I had $33.73 charge added to cell phone bill. It was coded as
       Direct Bill Communications Downloads. Knew it was unfounded.
18      Got on the phone with Cingular to have it removed. It was put on
       by m-qube. The operator I was talking to proceeded to tell me that
19      this company sends out a text to you and even if you don't accept
       the text you are automatically subscribed to them, for 33.73. Oh
20      reeeeeally! How nice. I was furious. How many thousands of
       people have been billed as I?"
21

22      "Several months ago I started getting charges to my Cingular
       account titled M-Qube. The local store has long waiting lines but I
23      took the time to wait to remedy the situation. The sales assistant
       was rube and informed me I had gone online and authorized this. I
24      never authorized or had ever visited the M-Qube site. After a long
       discussion he informed me that he would credit the charges but that
25      it was still my fault. He told me that I must be opening the
       messages which I had never done. He assured me that he had
26      stopped the messages from coming again.

27

28

4

"The next month I again received charges. I went to the store and found about an hour wait. After waiting for 30 minutes I phoned the Cingular 800 customer service # and continued waiting in line. After a long discussion and two reps they told me that they may not be able to credit the charges. They also told me they could not stop future charges and I had to call M-Qube to cancell what I had never ordered. They also told me the opposite the previous rep had about the charges – that I had to open the messages to decline the offer to keep from being charged. I hung up the phone and left the store after having been there for 45 minutes."

"I was charged $21.19 by Cingular for 'm-Qube') 'downloading charges on my cell', which I don't have 'enabled'! After several different phone calls to various members, they would all refer me to another…. You have to keep a constant check on your bills from ALL!"

16.    When the carrier sends its usual monthly bill to the cell phone subscriber, it includes the charges for such mobile content. Cingular keeps its share of the mobile content charges and then remits the balance to m-Qube. Defendants m-Qube and Cingular have registered hundreds of millions of transactions and processed hundreds of millions of dollars over the years and has profited enormously from its arrangement with Cingular and its content provider partners.

17.    As a result, Cingular and m-Qube has for years been systematically, repeatedly and without authorization, billing its customers for products and services not authorized to be purchased by those customers. If such purchases were authorized at all, they were authorized by previous owners and/or users of such telephone numbers. Cingular and m-Qube have, on information and belief, profited greatly from this practice.

## CLASS ALLEGATIONS

18.    Plaintiff brings this action, pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), on behalf of themselves and a class (the "Class") consisting of all wireless telephone subscribers in California and the nation who were billed by Defendants m-Qube and Cingular for products or services not authorized by the existing owner of the telephone number. Defendant m-Qube and Cingular and their employees are excluded from the Class.

5

1    19.    The Class consists of thousands of individuals and other entities, making joinder

2    impractical, in satisfaction of Rule 23(a)(I).  The law of California can be applied to all class

3    members.

4    20.    The claims of the representative Plaintiff are typical of the claims of all of the other

5    Class members.  The law of California should be applied to all claims asserted.

6    21.    The Plaintiff will fairly and adequately represent and protect the interests of the

7    other Class members. The Plaintiff has retained counsel with substantial experience in prosecuting

8    complex litigation and class actions. The Plaintiff and counsel are committed to vigorously

9    prosecuting this action on behalf of the other Class members, and have the financial resources to

10    do so.  Neither the Plaintiff nor their counsel have any interests adverse to those of the other Class

11    members.

12    22.    Absent a class action, most Class members would find the cost of litigating their

13    claims to be prohibitive, and will have no effective remedy. The class treatment of common

14    questions of law and fact is also superior to multiple individual actions or piecemeal litigation in

15    that it conserves the resources of the courts and the litigants, and promotes consistency and

16    efficiency of adjudication.

17    23.    Defendants m-Qube and Cingular have acted and failed to act on grounds generally

18    applicable to the Plaintiff and the other Class members, requiring the Court's imposition of

19    uniform relief to ensure compatible standards of conduct toward the Class members.

20    24.    The factual and legal bases of m-Qube and Cingular Defendants' liability to the

21    Plaintiff and to the other Class members are the same, resulting in injury to the Plaintiff and to all

22    of the other Class members.  The Plaintiff and other Class members have all suffered harm and

23    damages as a result of all of the m-Qube and Cingular Defendants' unlawful and wrongful

24    conduct.

25    25.    There are many questions of law and fact common to the Plaintiff and the other

26    Class members, and those questions predominate over any questions that may affect individual

27    Class members within the meaning of Rule 23(a)(2) and 23(b)(3).

28

**FIRST CAUSE OF ACTION**
**[Consumer Legal Remedies Act "CLRA"]**
**[Violations of Civil Code §§1750, *et seq.*]**
**[Against All Defendants]**

26.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

27.    Defendant m-Qube is a "person" as defined by Civil Code § 1761(c). Defendant Cingular is a "person" as defined by Civil Code § 1761(c).

28.    Plaintiff and Class are "consumers" within the meaning of Civil Code § 1761(d).

29.    The Consumer Legal Remedies Act applies to m-Qube and Cingular Defendants' actions and conduct described herein because it extends to transactions that are intended to result, or which have resulted, in the sale or lease of goods and/or providing services to consumers.

30.    The products that Plaintiff and each other member of the Class purchased from m-Qube are "goods" within the meaning of Civil Code Section 1761(a).

31.    Defendant m-Qube offers for sale and sells products, when at all relevant times, Defendant m-Qube knew or should have known that such actions constitute omissions and concealment of material facts that are unfair, deceptive, and misleading business practices in violation of Civil Code §§1770(a)(1)(2)(3) and (5).

32.    Defendant Cingular intended that Plaintiff and Class would rely on its deception by paying additional costs for unordered goods and/or services, unaware of the material described above. This conduct constitutes consumer fraud, an unfair business practice and violation of the CLRA.

33.    The conduct described herein by m-Qube and Cingular Defendants is unlawful pursuant to California Civil Code §§1770(a)(1)(2)(3) and (5). M-Qube and Cingular Defendants' deceptive acts and omissions occurred in the course of selling a consumer product and have occurred continuously through the filing of this Complaint.

34.    As a direct and proximate result of Defendants' violations of Civil Code Section 1750, *et seq.*, Plaintiff and the other Class members have suffered irreparable harm and monetary damages. Plaintiff, on behalf of himself and on behalf of the Class, seeks all relief allowable under the CLRA.

7

1    35.    ` Through the filing of the initial Complaint on June 28, 2207, Plaintiff has complied

2    with the notice provisions of Civil Code §1782, and therefore seeks damages for himself pursuant

3    to the CRLA.

4    ### SECOND CAUSE OF ACTION
     **[Unfair Competition & False Advertising]**

5    **[Violation of Bus. & Prof. Code Sections 17200 and 17500]**
     **[Against All Defendants]**

6

7    36.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth

8    herein and further alleges as follows:

9    37.    Plaintiff brings this cause of action on behalf of himself, on behalf of the Class, and

10   in his capacity as private attorney general.

11   38.    Defendants m-Qube and Cingular have engaged, and continue to engage, in unfair,

12   unlawful and fraudulent business acts and practices of unauthorized billing.

13    ·39.    Beginning on a date unknown to Plaintiff and continuing to the present, Defendants

14   m-Qube and Cingular have engaged in, are engaged in, and propose to engage in unfair

15   competition, as that term is defined in Business and Professions Code §17200.

16   40.    As used in this Complaint and in §17200, "unfair competition" means (1) an

17   unlawful, unfair or fraudulent business act or practice; (2) unfair, deceptive, untrue or misleading

18   advertising; and/or (3) an act prohibited by Chapter 1 (commencing with § 17500) of Part 3 of

19   Division 7 of the Business and Professions Code. This conduct is actionable pursuant to Business

20   and Professions Code §§17200, 17203.

21   41.    In engaging in conduct which constitutes unfair competition, Defendants have

22   acquired money or property from members of the general public. It is impossible for the Plaintiff

23   to determine the exact amount of money that Defendants have obtained without a detailed review

24   of Defendants' books and records. Specifically, Defendants have engaged in, are engaged in, and

25   propose to engage in unlawful, unfair, and fraudulent business acts and practices, each of which

26   independently constitute Unfair Competition.

27

28

42. Under the circumstances alleged herein, it would be inequitable and would result in a miscarriage of justice for Defendants m-Qube and Cingular to continue to retain the property of Plaintiff and the Class.

43. M-Qube and Cingular Defendants' practice is unfair because it is not fully and adequately disclosed at the time that customers contract to obtain their wireless telephone service through Cingular and, therefore, is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to the Class.

44. Defendant Cingular's practice is unlawful because it violates the Federal Communications Act and the Consumer Legal Remedies Act. Defendant Cingular's practice is also unlawful because it constitutes unjust enrichment.

45. M-Qube and Cingular Defendants' practice is fraudulent because it has deceived and is likely to deceive members of the Class.

46. Unless m-Qube and Cingular Defendants are enjoined from continuing to engage in this unfair, unlawful, and fraudulent business practice, Plaintiff and Class will continue to be injured by m-Qube and Cingular Defendants' actions and conduct.

47. So as not to be unjustly enriched by their own wrongful actions and conduct, m-Qube and Cingular Defendants should be required to disgorge and restore to Plaintiff and Class all monies wrongfully obtained by m-Qube and Cingular Defendants as a result of their, unlawful and fraudulent business practice, together with interest thereon.

48. Pursuant to Business and Professions Code §17203, the Court may impose injunctive relief against any conduct found to constitute unfair competition pursuant to Business and Professions Code §17200. The court may also make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

49. Plaintiff, on behalf of himself, the Class, and the general public seeks restitution, and all other relief allowed under Section 17200, *et seq.*

9

## THIRD CAUSE OF ACTION
### [Unjust Enrichment]
### [Against All Defendants]

50.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

51.    A benefit has been conferred upon m-Qube and Cingular Defendants by Plaintiff and the Class. These Defendants have received and retain money belonging to Plaintiff and the Class resulting from its billing and collecting of millions of dollars in unauthorized third party mobile content charges, and in particular, its practice of systematically, repeatedly and without authorization, causing Plaintiff and the Class of cellular telephone customers to be billed by their cellular carriers for mobile content services authorized to be purchased, if at all, by the previous owners and/or users of such telephone numbers.

52.    M-Qube and Cingular Defendants appreciate or have knowledge of said benefit.

53.    Under principles of equity and good conscience, m-Qube and Cingular Defendants should not be permitted to retain the money belonging to Plaintiff and the Class which these Defendants have unjustly received as a result of its actions.

## FOURTH CAUSE OF ACTION
### [Declaratory and Injunctive Relief]
### [Against All Defendants]

54.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

55.    There exists an actual controversy under the terms of Defendants' service agreements, and applicable law governing those agreements, as to whether Defendants can charge their customers for services not requested.

56.    Plaintiff, on behalf of himself, the Class, and the general public, seeks declaratory and injunctive relief to stop Defendants' common practice of causing cellular telephone customers to be improperly billed for wireless content services that the customer did not order.

57.    Plaintiff, on behalf of himself, the Class, and the general public, seeks declaratory and injunctive relief to stop Defendants' common and unlawful practice of re-using cellular

1    telephone numbers that are encumbered with undisclosed pre-existing billing obligations, which

2    the practice thereof resulted in unauthorized charges to customers' accounts.

3        58.    These questions are common to the members of the Class who seek declaration of

4    their rights and legal obligations in addition to such other relief as might be granted by this Court.

5

6

7    ### FIFTH CAUSE OF ACTION
8    [Violation of 47 U.S.C §201]
     [Against Cingular Defendant Only]

9        59.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth

10   herein and further alleges as follows:

11       60.    Cingular is a common carrier engaged in interstate communications by wire for the

12   purpose of furnishing communications services within the meaning of § 201(a) of the Federal

13   Communications Act.

14       61.    Section 201 of 47 U.S. Code provides in relevant part as follows:

15       All charges, practices, classifications, and regulations for and in
16   connection with such communication service [i.e., interstate or
     foreign communication by wire or radio], shall be just and
17   reasonable, and any such charge, practice, classification, or
     regulation that is unjust or unreasonable is declared to be unlawful.

18       62.    Cingular's practice of charging Plaintiff and Class members for services they never

19   ordered or subscribed to is unjust and unreasonable, and therefore violates the said statute.

20       63.    As a direct and proximate result of Cingular's violations of § 201 of the Federal

21   Communications Act, Plaintiff and the Class have been damaged in an amount according to proof

22   in trial.

23   ### SIXTH CAUSE OF ACTION
24   [Violation of California Public Utilities Code §2890]
     [Against Cingular Defendant Only]

25       64.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth

26   herein and further alleges as follows:

27

28

65.    Cingular is a telephone corporation and public utility as defined in California Pub.

Util. Code Sections 216 and 234 and is certified by the California Public Utilities Commission

("CPUC") to offer, and does in fact offer and sell, mobile cellular telecommunication services

throughout the State of California.

66.    California Public Utilities Code Section 2106 provides aggrieved persons the

following private right of action:

> Any public utility which does, causes to be done, or permits any
> act, matter, or thing prohibited or declared unlawful, or which
> omits to do any act, matter, or thing required to be done, either by
> the Constitution, any law of this State, or any order or decision of
> the commission, shall be liable to the persons or corporations
> affected thereby for all loss, damages, or injury caused thereby or
> resulting therefrom.  If the court finds that the act or omission was
> willful, it may, in addition to the actual damages, award exemplary
> damages.  An action to recover for such loss, damage, or injury
> maybe brought in any court of competent jurisdiction by any
> corporation or person.

67.    Cingular's unlawful charging is further exacerbated by its failure to strictly comply

with various disclosure-related requirements of Public Utilities Code Section 2890, making it more

difficult for customers to discover the unauthorized charges, realize what their options are, and

thereafter dispute said charges.

68.    Defendant Cingular violated Section 2890 by virtue of its conduct alleged above,

including its billing for products or services, the purchase of which Plaintiff never authorized,

thereby causing Plaintiff and the members of the Class to suffer loss, damage, and injury.

69.    Although required to do so, the bills issued by Cingular failed to include

information with regard to the entity that charged for the products or services, failed to include a

toll-free telephone number or other no-cost means of contacting the entity responsible for

resolving disputes regarding the charge and a description of the manner in which a dispute

regarding the charge may be addressed, failed to include the name of the party responsible for

generating the charge, failed to include descriptions of the service, product, or other offering for

which charges had been imposed, and failed to indicate how to dispute specific charges.

70.    Cingular systematically failed to adhere to these cramming rules in its treatment of

Plaintiff and other affected customers.  Public Utilities Code Section 2890(e) further requires that

1  an entity responsible for generating a charge on a telephone bill receives "a complaint from a

2  subscriber that the subscriber did not authorize the purchase of the product or service associated

3  with that charge, the entity, not later than 30 days from the date on which the complaint is

4  received, shall verify the subscriber's authorization of that charge or undertake to resolve the

5  billing dispute to the subscriber's satisfaction."

6      71.    Plaintiff and the Class dispute said charges and, thus, are entitled to a presumption

7  that said charges were unauthorized. Pursuant to Public Utilities Code Section 2890(d)(2)(D), if

8  there is a dispute, "there is a rebuttable presumption that an unverified charge for a product or

9  service was not authorized by the subscriber and that the subscriber is not responsible for that

10  charge."

11      72.    Cingular's conduct is by no means accidental. As hereinbefore alleged, Cingular

12  knows that these previously-used numbers often are encumbered with pre-existing subscriptions,

13  that Cingular knows that the cell phone numbers it issues include numbers previously assigned to

14  former customers, and knows, from admitted receipt of customer complaints about billings for pre-

15  existing subscriptions, that among the numbers it issues are numbers with pre-existing

16  subscriptions. Despite this knowledge Cingular has not set up procedures to insure that the

17  numbers it assigns to new customers have been cleansed of pre-existing and undisclosed

18  subscriptions. In light of its knowledge of these facts, Cingular's decision to continue issuing

19  phone numbers without taking any steps to cleanse them constitutes a deliberate and willful

20  scheme to cheat large numbers of people out of small amounts of money.

21      73.    Because the amount Cingular is taking is small on an individual basis, and because

22  of Cingular's vast resources and superior bargaining power, Cingular employs this scheme with

23  the hope and expectation that its illegal conduct will go unpunished.

24      74.    Plaintiff and the Class are entitled to actual damages pursuant to Public Utilities

25  Code Section 2106. Plaintiff and the Class are further entitled to exemplary damages to the extent

26  the evidence shows that Defendant's violations were willful.

27

28

13

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themselves and the Class, pray for the following relief:

(a)    That the Court certify this case as a class action, appoint the undersigned as class counsel, and appoint Plaintiff as the Class representative;

(b)    That the Court declare that the actions of Defendants m-Qube and Cingular, as set out above, constitute unjust enrichment, are in violation of 47 U.S.C. §201, California Public Utilities Code §2890 and California Civil Code §1750 and California Business and Professions Code §§17200 and 17500.

(c)    That the Court enter judgment against Defendants m-Qube and Cingular for all economic, monetary, actual, consequential, and compensatory damages caused by these Defendants' conduct, and if these Defendants' conduct is proved willful award Plaintiff and the Class exemplary damages;

(d)    That the Court award Plaintiff and the Class reasonable costs and attorney's fees;

(e)    That the Court award Plaintiff and the Class pre- and post-judgment interest, including interest not paid on any credits previously provided;

(f)    That the Court enter judgment for an injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class;

(g)    That the Court award such other and further relief as equity and justice may require.

1

## JURY DEMAND

2

Plaintiff requests trial by jury of all claims that can be so tried.

3

Date:  September 21, 2007                    Respectfully submitted,

4

5                                            AUDET & PARTNERS, LLP

6

7                                            William M. Audet (CA 117456)
8                                            Adel A. Nadji (CA 232599)
                                             221 Main Street, Suite 1460
9                                            San Francisco, California 94105
                                             Telephone:  415.568.2555
10                                           Facsimile: 415.568.2556

11                                           *Attorneys for Plaintiff and the Class*

12
    Of Counsel:
13  Siamak Pishvaee, JD, MBA
    Pishvaee & Associates
14  2934 1/2 Beverly Glen Circle, #269
    Bel Air, CA 90077
15  Telephone: (310) 694-8080
    Facsimile: (310) 694-8081
16

17

18

19

20

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE

2

### STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO

3         I am employed in the County of San Francisco, State of California; my business address is
221 Main Street, Suite 1460, San Francisco, California 94105. I am over the age of 18 and not a

4   party to the within action. On this date I served the following documents:

5

### FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND
6   ### INJUNCTIVE RELIEF

7   on the parties shown below:

8

9   Ronald L. Johnston                                      James L. Cooper
    Angel L. Tang                                           Laura Riposo Vandruff
10  ARNOLD & PORTER LLP                                     ARNOLD & PORTER LLP
    777 South Figueroa Street, 44th Floor                   555 12th Street, NW
11  Los Angeles, CA 90017                                   Washington, DC 20004
    Facsimile: (213) 243-4199                               Facsimile: (202) 942-5999
12  *Attorneys for Defendants VeriSign, Inc. and*           *Attorneys for Defendants VeriSign, Inc. and m-*
    *m-Qube, Inc.*                                          *Qube, Inc.*

13

14  [X]  (BY FAX) I am readily familiar with the firm's practice of facsimile transmission; on this
         date the above-referenced documents were transmitted, the transmission was reported as
15       complete and without error and the report was properly issued.

16  [X]  (BY MAIL) I am readily familiar with the firm's practice for the processing of mail; on this
         date, the above-referenced documents were placed for collection and delivery by the U.S.
17       Postal Service following ordinary business practices.

18  [ ]  (BY ELECTRONIC FILING) On this date I provided the documents(s) listed above
         electronically through the Court's electronic filing service provider pursuant to the
19       instructions on that website.

20  [ ]  (BY E-MAIL) On this date, the above-referenced documents were converted to electronic
         files and e-mailed to the addresses shown.

21
22  [ ]  (BY PERSONAL SERVICE) I caused the above documents to be delivered by hand pursuant
         to CCP § 1011.

23  [X]  Federal: I declare that I am employed in the office of a member of the bar of this court at
         whose direction the service was made.

24
25  [ ]  State: I declare under penalty of perjury under the laws of the State of California that the
         above is true and correct.

26  Executed on this 21st day of September, 2007 at San Francisco, California.

27

28

**EXHIBIT E**

IMAGED

OCT 1 6 2007

**FILED**

San Francisco County Superior Court

OCT 1 6 2007

GORDON PARK-LI, Clerk

BY: _____
            Deputy Clerk

1  TERRY M. GORDON - SBN 75604
   LAW OFFICES OF TERRY M. GORDON
2  Three Harbor Drive, Suite 215
   Sausalito, California 94965
3  Telephone:    (415) 331-3601
   Facsimile:    (415) 331-1225
4

5  JOHN G. JACOBS (*PENDING PRO HAC VICE*)
   BRYAN G. KOLTON (*PENDING PRO HAC VICE*)
6  THE JACOBS LAW FIRM, CHTD.
   122 South Michigan Avenue
7  Suite 1850
   Chicago, Illinois 60603
8  Telephone: (312) 427-4000
   Facsimile: (312) 427-1850
9

10 JOHN BLIM (*PENDING PRO HAC VICE*)
   JAY EDELSON (*PENDING PRO HAC VICE*)
11 MYLES MCGUIRE (*PENDING PRO HAC VICE*)
   BLIM & EDELSON, LLC
12 53 West Jackson Boulevard
   Suite 1642
13 Chicago, Illinois 60604
   Telephone: (312) 913-9400
14 Facsimile: (312) 913-9401

15 ATTORNEYS FOR PLAINTIFF

CASE MANAGEMENT CONFERENCE SET

MAR 1 4 2008 - 9ᵃᵐ AM

DEPARTMENT 212

SUMMONS ISSUED

16          SUPERIOR COURT OF THE STATE OF CALIFORNIA
               FOR THE COUNTY OF SAN FRANCISCO
17

18 LOUIS JIRAN AND DELORES GRESHAM,      )  Case No. CGC07-468268
   individually and on behalf of a class of   )
19 similarly situated individuals,            )  **COMPLAINT FOR DAMAGES**
                                              )  **AND INJUNCTIVE RELIEF**
20               Plaintiffs,                  )
                                              )
21     v.                                     )
                                              )  DEMAND FOR JURY TRIAL
22 AT&T MOBILITY, LLC d/b/a The New          )
   AT&T f/k/a CINGULAR WIRELESS, a           )  **CLASS ACTION**
23 Delaware limited liability company,        )
   VERISIGN, INC., a Delaware corporation,    )
24 M-QUBE, INC., a Delaware corporation,      )
   MBLOX, INC., a Delaware corporation, and   )
25 MOBILE MESSENGER AMERICAS, INC.,           )
   a Delaware corporation,                    )
26                                            )
                   Defendants.                )
27

28

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

BY FAX

1
## CLASS ACTION COMPLAINT

2         Plaintiffs Louis Jiran ("Jiran") and Delores Gresham ("Gresham"), on behalf of

3  themselves and two classes of similarly situated individuals, bring this class action against

4  AT&T Mobility, LLC d/b/a the new AT&T f/k/a Cingular Wireless ("AT&T"), VeriSign,

5  Inc. ("VeriSign"), m-Qube, Inc. ("m-Qube"), Mobile Messenger Americas, Inc. ("Mobile

6  Messenger") and mBlox, Inc. ("mBlox") (collectively, "Defendants") seeking to stop

7  Defendants' practice of causing cellular telephone customers to be billed for mobile content

8  services ordered not by them, but rather by the customer previously assigned their telephone

9  number, and to obtain redress for all persons injured by their conduct.  Plaintiffs, for their

10 class action complaint, allege as follows upon personal knowledge as to themselves and their

11 own acts and experiences, and, as to all other matters, upon information and belief, including

12 investigation conducted by their attorneys.

13
## NATURE OF THE CASE

14         1.     In a widespread industry practice little known by those outside the industry,

15 wireless telephone "carriers" such as AT&T routinely "recycle" so-called "dirty" telephone

16 numbers to their customers when they sign up for new cellular telephone service.  The

17 numbers are "recycled" in that they were previously owned and/or used by other persons or

18 entities.  The numbers are "dirty" in that they are encumbered with pre-existing billing

19 obligations for products and services authorized to be purchased, if at all, by the previous

20 subscriber assigned those telephone numbers.

21         2.     AT&T's practice of re-issuing "dirty" phone numbers has resulted in

22 unauthorized charges being placed on unsuspecting customers' telephone bills, in an illegal

23 practice known as "cramming."  For years, carriers such as AT&T and billing intermediaries

24 known in the industry as "aggregators" such as Defendants VeriSign, m-Qube, mBlox and

25 Mobile Messenger have, on their behalves and on behalf of third-party "mobile content

26 providers," systematically, repeatedly and without authorization, placed charges on

27

28
## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 2 -

1  customers' monthly cell phone bills for mobile content services and subscriptions (i.e.,

2  ringtones, joke-a-day programs, wallpaper, screensavers, text alerts, etc.) that were never

3  authorized to be purchased by the current owners of the affected phone numbers.

4    3.    As set forth below, AT&T's conduct was and is: (a) in breach of contract and

5  the duty of good faith and fair dealing, (b) in violation of California Public Utilities Code

6  section 2890 and (c) in violation of California Business and Professions Code section

7  17200's consumer fraud provisions.  The "aggregator" Defendants' conduct was and is: (a) in

8  violation of California Business and Professions Code section 17200's consumer fraud

9  provisions; (b) unjust enrichment; and (c) tortious interference with a contract.

10    4.    Because of Defendants' wrongful actions, Plaintiffs seek money damages,

11  injunctive and declaratory relief, costs, and reasonable attorneys' fees on behalf of

12  themselves and the class members.

13                    **PARTIES**

14    5.    Plaintiff Louis Jiran is a citizen of Florida.

15    6.    Plaintiff Deloris Gresham is a citizen of Mississippi.

16    7.    Defendant AT&T Mobility, LLC d/b/a the new AT&T Wireless ("AT&T")

17  f/k/a Cingular Wireless is a leading provider of cellular telephone service in the United

18  States.  AT&T is a Delaware limited liability company with its headquarters and principal

19  place of business in the State of Georgia.  AT&T does business and has offices throughout

20  the United States, including the State of California and this County.

21    8.    Defendant m-Qube, Inc. ("m-Qube"), a self-proclaimed "leading mobile

22  channel enabler," is an "aggregator" and operates a mobile transaction network that

23  processes mobile payments on its behalf and on behalf of carriers, other aggregators and third

24  party mobile content providers.  m-Qube is a Delaware corporation with its headquarters and

25  principal place of business in the State of California.  m-Qube does business throughout the

26  United States, including the State of California and this County.

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1    9.    Defendant VeriSign, Inc. ("VeriSign") is an aggregator with a self-proclaimed

2    "market-leading portfolio of managed communications and content offerings" whose

3    operations have become essentially merged with those of its subsidiary m-Qube.  In May

4    2006, VeriSign acquired m-Qube and has since integrated and operated many of m-Qube's

5    aggregator systems including, but not limited to, those processing communications and/or

6    mobile content charges that are the subject of this suit.   VeriSign is a Delaware corporation

7    with its headquarters and principal place of business in the State of California.  VeriSign does

8    business throughout the United States, including the State of California and this County.

9    10.    Defendant mBlox, Inc. ("mBlox"), is an aggregator and operates a mobile

10   transaction network that processes mobile payments on its behalf and on behalf of carriers

11   and third party mobile content providers.  mBlox is a Delaware corporation with its

12   headquarters and principal place of business in the State of California.  mBlox does business

13   throughout the United States, including the State of California and this County.

14   11.    Defendant Mobile Messenger Americas, Inc. ("Mobile Messenger"), the

15   North American subsidiary of an Australian mobile marketing company, is a so-called

16   "secondary aggregator" who provides billing and aggregating services in the United States to

17   a clientele that, on information and belief, consists primarily of foreign mobile content

18   providers that sell mobile content to consumers in the United States.  On information and

19   belief, Mobile Messenger subcontracts with domestic aggregators such as m-Qube to obtain

20   access to m-Qube's existing domestic carrier relationships and technical infrastructure.

21   Mobile Messenger is a Delaware corporation with its headquarters and principal place of

22   business in the State of California.  Mobile Messenger does business throughout the United

23   States, including the State of California and this County.

24                                **JURISDICTION**

25   12.    This Court has jurisdiction over the causes of action asserted herein pursuant

26   to the California Constitution, Article VI, §10, because this case is a cause not given by

27

28
─────────────────────────────────────────
**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

1  statute to other trial courts.

2      13.    This Court has jurisdiction over Defendants pursuant to Code of Civil

3  Procedure section 410.10 because Defendants reside in and/or conduct business in the State

4  of California and/or many of Defendants' wrongful acts arose or emanated from California.

5                                       **VENUE**

6      14.    Venue is proper in this Court pursuant to Code of Civil Procedure §§ 395 and

7  395.5 because at least one of the Defendants, AT&T, has not filed a statement with the

8  California Secretary of State designating a principal office within the State of California.

9      **THE PROBLEM OF RECYCLING DIRTY CELL PHONE NUMBERS**

10     15.    Cell phone customers are assigned unique phone numbers for their phones,

11 just like traditional land-lines.

12     16.    However, unlike traditional phones, people can use cell phones to pay for

13 certain third-party-provided mobile content services and subscriptions, like, for example,

14 "ring tones," games, horoscopes, text alerts, jokes, and stock quotes sent periodically to

15 customers' cell phones, etc. (A ringtone is simply the sound made by a telephone to indicate

16 an incoming call. The term is most often used to refer to the customizable sounds available

17 on mobile phones.)

18     17.    These services are generally subscription based and renew automatically each

19 month, and the resulting charges are included on the customer's cell phone bill.

20     18.    The instant lawsuit flows from what happens when a carrier, such as AT&T,

21 reissues (or "recycles") a cellular number previously assigned to a customer who then gave

22 up the number.   (Customers abandon numbers for many different reasons, e.g. they move to

23 a different area code, they change carriers, they no longer want one of their cell phones, or

24 they want a different phone number.)

25

26

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 5 -

1    19.    Defendants know that these abandoned numbers are often encumbered with

2    preexisting subscriptions to services provided by mobile content providers – thus rendering

3    these numbers "dirty."

4    20.    Nevertheless none of the Defendants has set up procedures wherein the dirty

5    numbers are "cleansed" of the preexisting subscriptions.  AT&T allows such third-party

6    services to be billed directly on a customer's monthly wireless bill, and it retains a substantial

7    portion of the charges collected thereon, and the aggregators in turn likewise receive a

8    substantial portion of the charges collected and pass the remainder on to the content

9    providers.  Essentially, AT&T joint ventures with the aggregators and content providers in

10   this lucrative and growing business and none has an interest in taking action that would

11   inhibit the substantial profits they realize from this illegal activity.

12   21.    Thus, when a telephone number is reassigned to a new customer, Defendants

13   continue to charge the new customer for subscriptions purchased by the old customers and

14   none takes action to see to it that they charge customers only for services they have ordered.

15               **THE FACTS RELATING TO NAMED PLAINTIFF JIRAN**

16   22.    On or about June 20, 2006, Jiran visited the website of an authorized AT&T

17   sales representative to purchase new cell phone service for his family's personal use.

18   23.    On that same day, in exchange for an AT&T cell phone plan called

19   "FamilyTalk Plan 1400 Minutes with Unlimited Nights and Weekends and Unlimited Mobile

20   to Mobile," Jiran agreed to pay AT&T approximately $80.00 per month for the first cellular

21   telephone line on the plan plus $9.99 for each of the three additional cellular telephone lines

22   on the plan.

23   24.    Upon purchasing AT&T's cellular telephone services and activation of his

24   cellular telephone account, AT&T provided Jiran a cellular telephone number of "[redacted]-

25   5945."

26

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

- 6 -

25.    Unbeknownst to Jiran, AT&T provided him with a recycled "dirty" phone number -- one saddled with pre-existing obligations, encumbrances and billing arrangements for products and services.

26.    Thus, beginning on or about June 24, 2006 – within days of Jiran's obtaining his cell phone number and starting to receive service from AT&T -- and continuing through approximately March 12, 2007, Plaintiff Jiran's cell phone received multiple unwanted "premium" text message calls and/or charges from Mobile Messenger on behalf of its client, Mobile Data Group, Inc. ("Mobile Data Group"), a third-party provider of mobile content. "Premium" text messages are services that result in "premium" charges on one's cell phone bill. "Premium" charges are those charges that result primarily from mobile content services, which are frequently provided by third-party mobile content companies. These charges resulted from subscription(s) made by the prior assignee(s) of the number that was then recycled to Jiran.

27.    Throughout the relevant period, Jiran received dozens of such messages and/or charges.

28.    At no time did Jiran authorize the purchase of these products and services from Mobile Messenger and at no time did Jiran consent to Mobile Messenger's sending of text messages to his cellular telephone.

29.    Beginning on June 24, 2006, and continuing throughout the relevant time period, AT&T billed Jiran a monthly "Premium Text Message" charge of $9.99 for such unauthorized text messages.

30.    Jiran's cell phone bill identified "Mobile Messenger" as the entity that sent the messages and caused the charges to be placed on his bill, but failed to identify the content provider responsible for generating the charge.

31.    At no time did Jiran authorize AT&T or anyone else to bill him for these products or services.

32.    On or about September 25, 2006, in what would become the first of numerous such efforts, Jiran contacted AT&T to inquire why his bills were so high and was told that it was because of premium text message charges from a company called m-Qube, Inc., who, Jiran later learned, was acting on behalf of Mobile Messenger, who was acting on behalf of one of its content provider clients.

33.    Jiran advised AT&T that he did not authorize the purchase of these products and services offered by m-Qube, Mobile Messenger or any other party and that at no time did he consent to being sent any of the text messages referred to herein.  Jiran then asked AT&T how he could stop being sent these unauthorized text messages for which he was being billed by AT&T and how he could obtain a full refund. While AT&T agreed at that time to a partial refund of the unauthorized "premium" charges that he had incurred, AT&T failed to issue a full refund for "standard" text message fees, taxes paid and/or interest lost due to AT&T's issuance of a "dirty" "recycled" phone number to him.   AT&T further refused to guarantee that it would stop future charges from being placed on the account and that he would instead have to contact either m-Qube or Mobile Messenger to do so.

34.    Thereafter, on or about December 21, 2006 and then again on or about March 12, 2007, Jiran learned that additional unauthorized premium text message charges had appeared on his cell phone bill and each time contacted AT&T.  Jiran was told that the charges had been placed on his bill by m-Qube, Inc., who was acting on Mobile Messenger's behalf.

35.    Jiran again advised AT&T that he did not authorize the purchase of these products and services offered by m-Qube, Mobile Messenger or any other party and that at no time did he consent to being sent any of the text messages referred to herein.  Jiran again asked AT&T how he could stop being sent these unauthorized text messages for which he was being billed and how he could obtain a full refund. While AT&T agreed at that time to a partial refund of the unauthorized "premium" charges that he had incurred, AT&T failed to

1    issue a full refund for "standard" text message fees, taxes paid and/or interest lost due to

2    AT&T's issuance of a "dirty" "recycled" phone number to him. Each time AT&T informed

3    Jiran that he would have to pay an early termination fee of approximately $175 if he wished

4    to cancel the account.

5         36.     AT&T never undertook to resolve the dispute to Jiran's satisfaction, never

6    sought to confirm whether he had, in fact, provided authorization to purchase products and

7    services offered by m-Qube, Mobile Messenger or any other party, never verified whether he

8    had, in fact, provided consent to m-Qube or Mobile Messenger to send any text message to

9    his telephone number, and never verified that he had, in fact, provided authorization to bill

10   his account for these charges. Rather, AT&T simply "passed the buck," advising Jiran to

11   contact m-Qube and Mobile Messenger.

12        37.     On multiple occasions thereafter, Jiran attempted to contact m-Qube, but was

13   unable to speak directly with anyone at the company who could credit him in full for such

14   unauthorized charges. m-Qube later contacted Jiran via email to confirm that it was billing

15   him on behalf of its client, Mobile Messenger, and to advise him that it had forwarded a

16   request to Mobile Messenger to remove his number from all its services. m-Qube never

17   offered to credit Jiran for the unauthorized charges.

18        38.     Mobile Messenger was then contacted through counsel to obtain further detail

19   regarding the date of Jiran's purported authorization to be sent and charged for the premium

20   text messages referred to herein.

21        39.     According to Mobile Messenger, the purported authorization was obtained by

22   Mobile Messenger's client Mobile Data Group from an unidentified person identified with

23   the same phone number eventually assigned by AT&T to Jiran. However, the authorization

24   for the subject charges was obtained in **2005** – a date at least *more than six months prior* to

25   the time that Jiran first purchased cell phone service from AT&T, obtained that same cell

26   phone number from AT&T, or started receiving AT&T service.

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 9 -

40.    Jiran could not possibly have authorized the charges for which he was being billed, as he was not in possession of the phone number in question nor did he have authority to bill such phone number.

### THE FACTS RELATING TO NAMED PLAINTIFF GRESHAM

41.    On or about April 1, 2006, Gresham called an authorized AT&T sales representative to purchase new cell phone service for her family's personal use.

42.    On that same day, in exchange for a AT&T cell phone plan called "FamilyTalk Nation 550 Rollover & Unlimited Night/Weekend & Unlimited Mobile-To-Mobile Minutes," Gresham agreed to pay AT&T approximately $50.00 per month for the first cellular telephone line on the plan plus an additional amount for the additional cellular telephone line on the plan.

43.    Upon purchasing AT&T's cellular telephone services and activation of her cellular telephone account, AT&T provided Gresham a cellular telephone number of "[redacted]-5164."

44.    Unbeknownst to Gresham, AT&T provided her with a recycled "dirty" phone number -- one saddled with pre-existing obligations, encumbrances and billing arrangements for products and services.

45.    Thus, beginning on or about April 19, 2006 -- within days of Gresham's obtaining her cell phone number and starting to receive service from AT&T -- and continuing through approximately May 26, 2006, Gresham's cell phone received multiple unwanted mobile content services and/or charges from mBlox on behalf of its client 9 Squared, Inc. ("9 Squared"), a third-party provider of mobile content.

46.    Throughout the relevant period, Gresham received several such services and/or charges.

1       47.    At no time did Gresham authorize the purchase of these products and services

2  offered by mBlox or its customers and at no time did she consent to mBlox's sending of

3  mobile content to her cellular telephone.

4       48.    Beginning on April 19, 2006, and continuing throughout the relevant time

5  period, AT&T repeatedly billed Gresham a charge of $9.99 for such unauthorized services.

6       49.    Gresham's cell phone bill identified "mBlox" as the entity that sent the mobile

7  content and caused the charges to be placed on her bill, but failed to identify the content

8  provider responsible for generating the charge.

9       50.    At no time did Gresham authorize AT&T or anyone else to bill her for these

10  charges.

11       51.    On or about August 15, 2007, in what would become the first of numerous

12  such efforts, Gresham contacted AT&T to inquire why her bills were so high and was told

13  that it was because of mobile content charges from a company called mBlox, who, she was

14  told by AT&T, was acting on behalf of a second company, mobile content provider Squared

15  9.

16       52.    Gresham advised AT&T that she did not authorize the purchase of these

17  products and services offered by mBlox and that at no time did she consent to being sent any

18  of the mobile content services referred to herein.  AT&T failed to issue a full refund for the

19  "premium" mobile content charges incurred, "standard" text message charges, taxes paid and

20  interest lost due to AT&T's issuance of a "dirty" "recycled" phone number to Gresham.

21       53.    AT&T never undertook to resolve the dispute to Gresham's satisfaction, never

22  verified that she had, in fact, provided authorization to purchase products and services

23  offered by mBlox and/or Squared 9, never verified whether she had, in fact, provided consent

24  to mBlox and/or Squared 9 to send mobile content to her telephone number, and never

25  verified that she had, in fact, provided authorization to bill her account for said charges.

26  Rather, AT&T simply "passed the buck," advising Gresham to contact mBlox and Squared 9.

27

28

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
- 11 -

54.  Squared 9 was then contacted through counsel to obtain further detail regarding the date of Gresham's purported authorization to be sent and charged for the mobile content referred to herein.

55.  According to Squared 9, the purported authorization to be sent and charged for such mobile content was obtained by mBlox's client Squared 9 from an unidentified person identified with the same phone number eventually assigned by AT&T to Gresham. However, the authorization for the subject charges was obtained in **September 2005** — a date at least *more than six months prior* to the time that Gresham first purchased cell phone service from AT&T, obtained that same cell phone number from AT&T, or started receiving AT&T service.

56.  Gresham could not possibly have authorized the charges for which she was being billed, as she was not in possession of the phone number in question nor did she have authority to bill such phone number.

## ADDITIONAL ALLEGATIONS APPLICABLE TO AT&T

57.  AT&T is a telephone corporation and public utility as defined in California Pub. Util. Code sections 216 and 234 and is certified by the California Public Utilities Commission ("CPUC") to offer, and does in fact offer and sell, mobile cellular telecommunication services throughout the State of California.

58.  AT&T uses uniform form contracts under which customers purchase cell phone services.

59.  AT&T's services include providing access to and billing for various third-party services such as ring tones, joke-a-day programs, wallpaper, screensavers and other forms of software provided by numerous third-party vendors, including those mentioned in this complaint.

1    60.    AT&T has contracted with third-party providers, for a fee, to bill and collect

2    from AT&T's customers for third party services that are included directly on a customer's

3    monthly wireless bill.

4    61.    Envisioning the potential for abuse, the California Legislature adopted

5    California Public Utilities Code section 2890 which provides, in relevant part, that: "(a) A

6    telephone bill may only contain charges for products or services, the purchase of which the

7    subscriber has authorized."

8    62.    Public Utilities Code section 2890 was intended to deter the unlawful practice

9    of "cramming," *i.e.*, the placing of unauthorized charges on telephone bills, as defined in the

10    Legislative History of Public Utilities Code sections 2889.9 and 2890:

11    ["This bill addresses the problem of 'cramming,' a practice in
     which consumers are charged for unauthorized services in their
12    phone bills. [¶] ... [¶] A relatively new, and growing, scam on
     telephone customers is the imposition of charges on the
13    telephone bill for products or services the customer has not
     bought.... [¶] Often the charges which are 'crammed' on the
14    customer's bill are relatively small, less than $10, and
     inconspicuously labeled. If one does not carefully scrutinize
15    the telephone bill, the crammed charge could easily be
     overlooked."]; Sen. Bill No. 378, approved by Governor, Sept.
16    30, 1998 (Amend.Aug.21, 1998) (1997 1998 Reg. Sess.) ["
     'Cramming' charges are usually comprised of services such as
17    unauthorized voice mail options, Internet access options,
     calling cards, paging services, and 800 numbers. In many
18    cases[,] these unauthorized charges are initiated from
     sweepstakes, raffles, and telemarketers of unknown and
19    unscrupulous companies."].)

20    Assem. Bill No. 2142, 3d reading May 7, 1998, Assem. Floor (1997 1998 Reg. Sess.).

21    63.    According to the CPUC, "the practice of cramming has become a serious and

22    widespread problem in California, draining time and money from California consumers and

23    businesses."

24    64.    Revised General Order 168, "Market Rules to Empower Telecommunications

25    Consumers and to Prevent Fraud" similarly provides that "Telephone companies may bill

26    subscribers only for authorized charges."

27

28

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
- 13 -

65.    Further, the duty of good faith and fair dealing, a part of every contract, requires that AT&T not bill any customer for any good or service not authorized by the customer.

66.    Upon execution of service contracts and activation of cellular telephone accounts, AT&T provides its customers a ten-digit cellular telephone number.

67.    As explained above, unbeknownst to its customers, AT&T often "recycles" "dirty" telephone numbers, numbers that were previously owned and/or used by other persons or entities and encumbered with pre-existing billing obligations for products and services authorized to be purchased.

68.    AT&T systems routinely provide customers with ten-digit cellular phone numbers that have not been properly "screened" and scrubbed "clean" so as to ensure that its customers are not adversely affected by the actions, inactions, obligations and/or encumbrances of previous owners and/or users of the telephone numbers.

69.    As a result, AT&T has for years been systematically, repeatedly and without authorization, billing its customers for products and services not authorized to be purchased by those customers.  Indeed, if such purchases were authorized, they were authorized by previous owners and/or users of such telephone numbers.  AT&T, aggregators and third-party service providers have, on information and belief, profited greatly from this practice.

70.    AT&T's unlawful charging is further exacerbated by its failure to comply strictly with various disclosure-related requirements of Public Utilities Code section 2890, making it more difficult for customers to discover the unauthorized charges, realize what their options are, and thereafter dispute said charges.

71.    Public Utilities Code section 2890(d) provides, in relevant part, as follows:

> (d) (1) A billing telephone company shall clearly identify, and use a separate billing section for, each person, corporation, or billing agent that generates a charge on a subscriber's telephone bill.  A billing telephone company may not bill for a person, corporation, or billing agent, unless that person, corporation or billing agent complies with paragraph (2).

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 14 -

(2) Any person, corporation, or billing agent that charges subscribers for products or services on a telephone bill shall do all of the following:

(A) Include, or cause to be included, in the telephone bill the amount being charged for each product or service, including any taxes or surcharges, and a clear and concise description of the service, product, or other offering for which a charge has been imposed.

(B) Include, or cause to be included, for each entity that charges for a product or service, information with regard to how to resolve any dispute about that charge, including the name of the party responsible for generating the charge and a toll free telephone number or other no cost means of contacting the entity responsible for resolving disputes regarding the charge and a description of the manner in which a dispute regarding the charge may be addressed. Each telephone bill shall include the appropriate telephone number of the commission that a subscriber may use to register a complaint.

72.    Although required to do so, the bills issued by AT&T systematically failed to include information with regard to how to dispute specific charges, failed to include the name of the party responsible for generating the charge, failed to include a toll-free telephone number or other no-cost means of contacting the entity responsible for resolving disputes regarding the charge and a description of the manner in which a dispute regarding the charge may be addressed. AT&T's bills also systematically failed to "include the appropriate telephone number of the commission that a subscriber may use to register a complaint," as required by section 2890(d) (2) (b).

73.    According to the CPUC, "[t]he obvious purpose of including the Commission's contact information is to safeguard consumers' Rights to Public Participation and Enforcement (consumers have a right to be informed of their rights and what agency enforces those rights) and Accurate Bills and Redress (consumers have a right to fair, prompt and courteous redress for problems they encounter). Without this information, many or most consumers won't realize what their options are."

74.    Public Utilities Code section 2890(e) further requires that "[i]f an entity responsible for generating a charge on a telephone bill receives a complaint from a subscriber

1   that the subscriber did not authorize the purchase of the product or service associated with

2   that charge, the entity, not later than 30 days from the date on which the complaint is

3   received, shall verify the subscriber's authorization of that charge or undertake to resolve the

4   billing dispute to the subscriber's satisfaction." AT&T systematically failed to adhere to

5   these "cramming" rules in its treatment of Plaintiffs and other affected customers.

6          75.    Pursuant to Public Utilities Code section 2890(d)(2)(D), "[i]f there is a

7   dispute, there is a rebuttable presumption that an unverified charge for a product or service

8   was not authorized by the subscriber and that the subscriber is not responsible for that

9   charge." Plaintiffs and the Class dispute said charges and, thus, are entitled to a presumption

10  that the charges were unauthorized.

11         76.    AT&T's conduct is by no means accidental. As hereinbefore alleged, AT&T

12  knows that the cell phone numbers it issues include numbers previously assigned to former

13  customers; knows that these previously-used numbers often are encumbered with pre-

14  existing subscriptions, and knows, from receipt of customer complaints about billings for

15  pre-existing subscriptions, that among the numbers it issues are numbers with pre-existing

16  subscriptions.

17         77.    Despite this knowledge AT&T has not set up procedures to insure that the

18  numbers it assigns to new customers have been cleansed of pre-existing and undisclosed

19  subscriptions.  In light of its knowledge of these facts, AT&T's decision to continue issuing

20  phone numbers without taking any steps to cleanse them constitutes a deliberate and willful

21  scheme to cheat large numbers of people out of small amounts of money.  Because the

22  amount AT&T is taking is small on an individual basis and because of AT&T's vast

23  resources and superior bargaining power, AT&T employs this scheme with the hope and

24  expectation that its illegal conduct will go unpunished.

25

26

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 16 -

## ADDITIONAL ALLEGATIONS APPLICABLE
### TO VERISIGN, M-QUBE, MOBILE MESSENGER AND MBLOX

78.     As aggregators, VeriSign, m-Qube, Mobile Messenger and mBlox operate mobile transaction networks helping companies develop, deliver, and bill for mobile content services such as ringtones, wallpapers, games, graphics, horoscopes, data, news, and information transmitted or received via chat services (collectively, "content") to compatible mobile devices throughout the State of California and the nation.

79.     Through VeriSign's, m-Qube's and mBlox's services, their end-to-end technology platforms, U.S. carrier relationships and other value-added services, they have become a one-stop shop for carriers such as AT&T, other "secondary" aggregators such as Mobile Messenger, and third-party mobile content providers such as Mobile Data Group and Squared 9, empowering them to take advantage of wireless as a content delivery, marketing and communications channel, while carving out a role for themselves as very critical middlemen in this rapidly growing industry.

80.     In order to tap into the emerging wireless content marketplace and make content services available to wireless consumers, content providers must first obtain access to wireless carriers' mobile communications networks and frequently do so by "partnering" with aggregators such as m-Qube, mBlox and VeriSign that provide their content providers clients direct access to the carriers through existing relationships.

81.     m-Qube, mBlox and Verisign have developed vast distribution systems that integrate into the wireless networks of some of the largest wireless carriers nationwide, providing direct connections to more than 500 mobile operators, including AT&T, Verizon, Sprint Nextel, T-Mobile, Alltel, US Cellular, among many others.

82.     Prior to its May 2006 purchase of m-Qube, VeriSign operated its own aggregator systems including, but not limited to, those processing communications and/or charges associated with recycled telephone numbers. Since its May 2006 purchase of m-Qube, VeriSign has integrated and operated many of m-Qube's aggregator systems

1  including, but not limited to, those processing communications and/or charges associated

2  with recycled telephone numbers.

3      83.    As the North American subsidiary of an Australian mobile marketing

4  company, Mobile Messenger provides aggregating services in the United States to a clientele

5  that, on information and belief, consists primarily of foreign mobile content providers

6  seeking to sell mobile content to consumers in the United States.  In order to provide such

7  services, Mobile Messenger subcontracts with domestic aggregators in the U.S. such as m-

8  Qube to access the latter's existing carrier relationships and technical infrastructure to

9  conduct mobile marketing campaigns on behalf of its overseas clients.

10  **VeriSign, m-Qube, Mobile Messenger and mBlox Have Caused Millions Of Dollars**
11  **In Unauthorized Third Party Mobile Content Charges To Be Billed and Collected**

12      84.    While aggregators such as VeriSign, m-Qube, Mobile Messenger and mBlox

13  charge their content provider customers some upfront fees, their revenue is primarily

14  generated through a "revenue share" on transactions for which they bill cell phone

15  subscribers: each time a charge is incurred in connection with mobile content services

16  offered by a content provider, the aggregator and/or the content provider cause the charge to

17  be billed directly on the cellular telephone bill of the carrier's customer currently assigned

18  the telephone number associated with the charge.

19      85.    The carrier then bills and collects the charge from the subscriber, retains a

20  substantial portion of the proceeds as its "revenue share" and then remits the balance to the

21  aggregator who has direct access to its network, who in turn retains a percentage of the

22  balance in the form of its own "revenue share" and in turn then remits the remainder directly

23  to the mobile content provider, or as the case may be, to another aggregator, e.g. Mobile

24  Messenger, who then retains a percentage of the balance in the form of its own "revenue

25  share" and then remits the balance to its mobile content provider client, e.g. Mobile Data

26  Group.

27

28

86.     VeriSign, m-Qube, Mobile Messenger and mBlox have registered thousands of transactions and processed many thousands of dollars in transactions over the years and have profited enormously from their arrangement with their carrier partners, aggregator partners and content provider partners.

87.     The vast majority of the conduct that led to the billing and collecting of unauthorized cell phone charges either occurred in California or was directed from here. The principal offices of all four aggregator Defendants are located in California. The act of processing unauthorized charges to consumers' cell phone bills frequently begins in California or is under the control of persons located within California. Many of the systems employed by the aggregator Defendants were distributed, developed and/or manufactured by persons located in California. Calls from subscribers nationwide to each aggregator Defendant route to a California location and subscribers are directed by the carriers to correspond with a Defendant at a California location. Press releases by the aggregator Defendants frequently disseminate from California. Business decisions for each aggregator Defendant are made in California. As the actions of the aggregator Defendants that lead to the unauthorized charges originate and/or are directed from locations in California, so too does AT&T's activity originate in California since the act, omission, or failure of any agent is the act, omission, or failure of its principal.

88.     As VeriSign, m-Qube, Mobile Messenger and mBlox know, carriers such as AT&T routinely "recycle" so-called "dirty" telephone numbers to their customers when they sign up for new cellular telephone service.

89.     VeriSign, m-Qube, Mobile Messenger and mBlox have not only sanctioned this illegal billing, they have actively and knowingly promoted it and profited from it by, *inter alia*, actively negotiating and facilitating partnerships between and amongst each other and/or other carriers, aggregators and content providers wherein (1) the content providers and aggregators do not adequately verify whether a telephone number has been recycled or

1  reassigned; (2) the carriers do not adequately verify the details of the purported authorization

2  to place charges on a cell phone customer's bill, including the identity of the person who

3  supposedly consented to the service, the date such consent was obtained or the manner in

4  which it was obtained; and/or (3) charges are illegally inserted into customers' billing

5  statements for subscriptions for subscriptions and mobile content services not authorized by

6  the persons assigned these recycled numbers, but rather by the subscriber previously assigned

7  the number.

8      90.    Indeed, if Defendants wanted to end this illegal billing, they could do so in an

9  instant. All they would have to do is ensure that the carriers and content providers report to

10  each other and to the aggregators (1) the identity of the person who subscribed to the services

11  in question, along with the date of that subscription, and (2) the identity of the current owner

12  of the phone number in question, along with the date he or she obtained that number. If the

13  identities do not match or the dates are inconsistent (i.e. the carrier's records show that the

14  consent date came prior to the date the current owner obtained his or her number), no charges

15  would be included on the customer's billing statement.

16     91.    Instead Defendants have intentionally created and maintained a system

17  wherein each participant has a piece of the information and thus can, at least, claim (false as

18  it is) that the blame rests at the feet of another. Such system constitutes a deliberate and

19  wilful scheme to cheat large numbers of people out of small amounts of money.

20     92.    As a direct result, Defendants have profited enormously from this illegal

21  practice, all the while maintaining a system designed to allow them to maintain plausible

22  deniability.

23                          **CLASS ALLEGATIONS**

24     93.    Plaintiffs bring this action, pursuant to Code of Civil Procedure § 382 on

25  behalf of themselves and two classes. Those classes are defined as follows:

26

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 20 -

1        A.  The "AT&T Class:": a class consisting of all AT&T wireless telephone

2  subscribers in the nation who were charged by AT&T for mobile content services where the

3  date of authorization for such charges preceded the date that the telephone number was

4  assigned by AT&T to such subscriber; provided, however, that the following are excluded

5  from this proposed Class: (i) the defendants, and (ii) any employee of a defendant.

6        B.  The "Aggregator Class:" a class consisting of all wireless telephone

7  subscribers in the nation who were charged by VeriSign, m-Qube, Mobile Messenger and/or

8  mBlox for mobile content services where the date of authorization for such charges preceded

9  the date that the telephone number was assigned to such subscriber by his or her wireless

10  carrier; provided, however, that the following are excluded from this proposed Class: (i) the

11  defendants, and (ii) any employee of a defendant.

12    94.    The Classes (hereafter, "the Classes") each consists of thousands of

13  individuals and other entities, making joinder impractical, in satisfaction of Code of Civil

14  Procedure § 382.

15    95.    The claims of Plaintiffs are typical of the claims of all of the other members of

16  the respective Classes.

17    96.    Plaintiffs will fairly and adequately represent and protect the interests of the

18  other members of the respective classes.  Plaintiffs have retained counsel with substantial

19  experience in prosecuting complex litigation and class actions.  Plaintiffs and their counsel

20  are committed to vigorously prosecuting this action on behalf of the other members of the

21  Classes, and have the financial resources to do so.  Neither Plaintiffs nor their counsel have

22  any interest adverse to those of the other members of the Classes.

23    97.    Absent a class action, most members of the Classes would find the cost of

24  litigating their claims to be prohibitive, and will have no effective remedy.  The class

25  treatment of common questions of law and fact is also superior to multiple individual actions

26

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1   or piecemeal litigation in that it conserves the resources of the courts and the litigants, and

2   promotes consistency and efficiency of adjudication.

3       98.    Defendants have acted and failed to act on grounds generally applicable to the

4   Plaintiffs and the other members of the respective Classes, requiring the Court's imposition

5   of uniform relief to ensure compatible standards of conduct toward the members of the

6   Classes.

7       99.    The factual and legal bases of Defendants' liability to Plaintiffs and to the

8   other members of the respective Classes are the same, resulting in injury to the Plaintiffs and

9   to all of the other members of the Classes.  Plaintiffs and the other Class members have all

10  suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

11      100.   There are many questions of law and fact common to the claims of Plaintiffs

12  and the other members of the respective Classes, and those questions predominate over any

13  questions that may affect individual members of the Classes.  Common questions for the

14  AT&T Class include but are not limited to the following:

15          (a)    Whether AT&T's conduct described herein is in breach of contract.

16          (b)    Whether AT&T's conduct described herein is in violation of

17      California's Public Utility Code section 2890.

18          (c)    Whether AT&T's conduct described herein violates California

19      Business and Professions Code sections 17200, *et seq*.

20      101.   Common questions for the Aggregator Class include:

21          (a)    Whether VeriSign, m-Qube, Mobile Messenger and/or mBlox have

22      unjustly received money belonging to Plaintiffs and the Aggregator Class and

23      whether under principles of equity and good conscience, m-Qube, Mobile Messenger

24      and/or VeriSign should not be permitted to retain it;

25          (b)    Whether VeriSign, m-Qube, Mobile Messenger and/or mBlox

26      tortiously interfered with Plaintiffs' and the Aggregator Class's contracts with their

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 22 -

1  wireless carriers by causing them to be charged for products and services by their

2  carrier that were authorized, if at all, by the previous owner and/or user of their

3  telephone number.

4         (c)     Whether VeriSign's, m-Qube's, Mobile Messenger's and/or mBlox's

5  conduct described herein violates California Business and Professions Code sections

6  17200, *et seq*.

7  **COUNT I**

8  **(Breach Of Contract on behalf of the AT&T Class)**

9      102.    Plaintiffs incorporate by reference the foregoing allegations.

10      103.    Plaintiffs and the AT&T Class entered into an agreement with Defendant

11  AT&T whereby Plaintiffs and the AT&T Class agreed to pay a certain sum of money in

12  exchange for AT&T's activation of Plaintiffs' and the AT&T Class's cellular telephone

13  account and its promise to provide various communication and related services to Plaintiffs

14  and the AT&T Class.

15      104.    Defendant AT&T expressly and/or impliedly agreed to provide Plaintiffs and

16  the AT&T Class with a cellular telephone number free of preexisting billing obligations for

17  products and services ordered, purchased and/or authorized by the previous owners and/or

18  users of said telephone numbers.

19      105.    Defendant AT&T further expressly and/or impliedly agreed to bill Plaintiffs

20  and the AT&T Class only for products or services the purchase of which they had authorized.

21      106.    Defendant AT&T further expressly and/or impliedly agreed to carry out its

22  obligations in good faith and fair dealing.

23      107.    Defendant AT&T breached its contractual obligations by providing Plaintiffs

24  and the AT&T Class with a phone number saddled with preexisting obligations,

25  encumbrances and billing arrangements for products and services ordered, purchased and/or

26  authorized, if at all, by the previous owners and/or users of said telephone numbers.

27

28

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

108.    Defendant AT&T further breached its contractual obligations, including its contractual obligation of good faith and fair dealing, by thereafter billing Plaintiffs and the AT&T Class for products or services, the purchase of which they never authorized.

109.    Plaintiffs and the AT&T Class have performed their obligations under the contract.

110.    The aforementioned breaches of contract have proximately caused the Plaintiffs and the AT&T Class economic injury and other damages

## COUNT II

**(Unauthorized Telephone Charges In Violation Of California Public Utilities Code § 2890 on behalf of the AT&T Class)**

111.    Plaintiffs incorporate by reference the foregoing allegations.

112.    California Public Utilities Code section 2106 provides aggrieved persons the following private right of action:

> Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom. If the court finds that the act or omission was willful, it may, in addition to the actual damages, award exemplary damages. An action to recover for such loss, damage, or injury maybe brought in any court of competent jurisdiction by any corporation or person.

113.    In an effort to deter the unlawful practice of "cramming," *i.e.*, the placing of unauthorized charges on telephone bills, the California legislature enacted Public Utilities Code section 2890, which provides, in pertinent part, as follows:

> (a) A telephone bill may only contain charges for products or services, the purchase of which the subscriber has authorized.

> (b) When a person or corporation obtains a written order for a product or service, the written order shall be a separate document from any solicitation material. The sole purpose of the document is to explain the nature and extent of

the transaction.  Written orders and written solicitation materials shall be unambiguous, legible, and in a minimum 10 point type.  Written or oral solicitation materials used to obtain an order for a product or service shall be in the same language as the written order.  Written orders may not be used as entry forms for sweepstakes, contests, or any other program that offers prizes or gifts.

(d) (1) A billing telephone company shall clearly identify, and use a separate billing section for, each person, corporation, or billing agent that generates a charge on a subscriber's telephone bill.  A billing telephone company may not bill for a person, corporation, or billing agent, unless that person, corporation or billing agent complies with paragraph (2).

(2) Any person, corporation, or billing agent that charges subscribers for products or services on a telephone bill shall do all of the following:

(A) Include, or cause to be included, in the telephone bill the amount being charged for each product or service, including any taxes or surcharges, and a clear and concise description of the service, product, or other offering for which a charge has been imposed.

(B) Include, or cause to be included, for each entity that charges for a product or service, information with regard to how to resolve any dispute about that charge, including the name of the party responsible for generating the charge and a toll free telephone number or other no cost means of contacting the entity responsible for resolving disputes regarding the charge and a description of the manner in which a dispute regarding the charge may be addressed. Each telephone bill shall include the appropriate telephone number of the commission that a subscriber may use to register a complaint.

(C) Establish, maintain, and staff a toll free telephone number to respond to questions or disputes about its charges and to provide the appropriate addresses to which written questions or complaints may be sent.  The person, corporation, or billing agent that generates a charge may also contract with a third-party, including, but not limited to, the billing telephone corporation, to provide that service on behalf of the person, corporation or billing agent.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

(D) Provide a means for expeditiously resolving subscriber disputes over charges for a product or service, the purchase of which was not authorized by the subscriber. In the case of a dispute, there is a rebuttable presumption that an unverified charge for a product or service was not authorized by the subscriber and that the subscriber is not responsible for that charge. With regard to direct dialed telecommunications services, evidence that a call was dialed is prima facie evidence of authorization. If recurring charges arise from the use of those subscriber initiated services, the recurring charges are subject to this section.

(E) If an entity responsible for generating a charge on a telephone bill receives a complaint from a subscriber that the subscriber did not authorize the purchase of the product or service associated with that charge, the entity, not later than 30 days from the date on which the complaint is received, shall verify the subscriber's authorization of that charge or undertake to resolve the billing dispute to the subscriber's satisfaction.

114.    Defendant AT&T violated section 2890 by virtue of its conduct alleged above, including its billing for products or services, the purchase of which Plaintiffs never authorized, thereby causing Plaintiffs and the members of the class to suffer loss, damage, and injury.

115.    Plaintiffs and the Sub-Class are entitled to actual damages pursuant to Public Utilities Code section 2106. Plaintiffs and the Sub-Class are further entitled to exemplary damages to the extent the evidence shows that Defendant's violations were willful.

## COUNT III

### (Unlawful, Unfair and Deceptive Business Practices in Violation of California Business & Professions Code § 17200, et seq. on behalf of all Classes)

116.    Plaintiffs incorporate by reference the foregoing allegations.

117.    The Unfair Business Practices Act proscribes unfair business competition and defines same to include any "unfair," "unlawful," or "fraudulent" business act or practice. California Business & Professions Code §17200 *et seq.*

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

118.    Defendants violated, and continue to violate this proscription through their conduct alleged above, including their violations of the California Public Utilities Code section 2890, as set forth above.

119.    Defendants, through their acts of unfair competition, have obtained money from Plaintiffs and members of the proposed Classes.  Plaintiffs and the members of the Classes ask that this Court restore this money to them and enjoin Defendants from continuing their illegal practices.

120.    Such conduct is ongoing and continues to this date.  Plaintiffs, the Class members and the general public are therefore entitled to the relief described herein.

**COUNT IV**
**(Restitution/Unjust Enrichment on behalf of the Aggregator Class)**

121.    Plaintiffs incorporate by reference the foregoing allegations.

122.    A benefit has been conferred upon VeriSign, m-Qube, Mobile Messenger and mBlox by Plaintiffs and the Aggregator Class.  VeriSign, m-Qube, Mobile Messenger and mBlox have received and retain money belonging to Plaintiffs and the Aggregator Class resulting from their billing and collecting vast sums in unauthorized third party mobile content charges, and in particular, their practice of systematically, repeatedly and without authorization, causing Plaintiffs and/or the Aggregator Class of cellular telephone customers to be billed by their cellular carriers for mobile content services authorized by prior owners/users of the number assigned to class member.

123.    VeriSign, m-Qube, Mobile Messenger and mBlox appreciate or have knowledge of said benefit.

124.    Under principles of equity and good conscience, VeriSign, m-Qube, Mobile Messenger and mBlox should not be permitted to retain the money belonging to Plaintiffs and the Aggregator Class which VeriSign, m-Qube, Mobile Messenger and mBlox have unjustly received as a result of their actions.

**COUNT V**

**(Tortious Interference with a Contract on behalf of the Aggregator Class)**

125.    Plaintiffs incorporate by reference the foregoing allegations.

126.    Plaintiffs and the Aggregator Class had contractual relationships with their wireless carriers whereby they agreed to pay a certain sum of money in exchange for activation of their cellular telephone accounts and their carriers' promise to provide various communication and related services to Plaintiffs and the Aggregator Class and to bill Plaintiffs and the Aggregator Class only for products or services the purchase of which they had authorized.

127.    VeriSign, m-Qube, Mobile Messenger and mBlox knew of said contractual relationships and intended to and did induce a breach or disruption of the contractual relationships.

128.    VeriSign, m-Qube, Mobile Messenger and mBlox intentionally interfered with said contractual relationship through improper motives and/or means by knowingly and/or recklessly continually causing to be placed on the cellular telephone bills of cellular telephone owners across the nation unauthorized charges.

129.    Plaintiffs and the Aggregator Class suffered loss as a direct result of the conduct of VeriSign, m-Qube, Mobile Messenger and/or mBlox.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Louis Jiran and Delores Gresham, on behalf of themselves and the respective Classes, pray for the following relief:

        a)    Certify this case as a class action on behalf of the Classes as defined above and appoint Louis Jiran and Delores Gresham Class Representatives, and appoint Jay Edelson and John G. Jacobs, as co-lead counsel;

        b)    Declare that the actions of AT&T, as set out above, as well as in other respects, constitute a breach of contract;

c)    Declare that the actions of AT&T, as set forth above, as well as in other respects, constitute a violation of California Public Utilities Code § 2890 and California Business & Professions Code § 17200 *et seq.*

d)    Enter judgment against AT&T for all economic, monetary, actual, consequential, and compensatory damages caused by its conduct, and if its conduct is proved willful, award Plaintiffs and the AT&T Class exemplary damages;

e)    Declare that the actions of VeriSign, m-Qube, Mobile Messenger and mBlox, as set out above, constitute unjust enrichment, tortious interference with a contract, and a violation of California Business & Professions Code § 17200 *et seq.*

f)    Enter judgment against VeriSign, m-Qube, Mobile Messenger and mBlox for all economic, monetary, actual, consequential, and compensatory damages caused by Defendants' conduct, and if its conduct is proved willful award Plaintiffs and the Aggregator Class exemplary damages;

g)    Award Plaintiffs and the Classes reasonable costs and attorneys' fees;

h)    Award Plaintiffs and the Classes pre- and post-judgment interest;

i)    Enter judgment for injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiffs and the Classes;

i)    Award such other and further relief as equity and justice may require.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 29 -

**JURY DEMAND**

Plaintiffs request trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: October 16, 2007

LAW OFFICES OF TERRY M. GORDON

By: _____
TERRY M. GORDON
One of the Attorneys for LOUIS JIRAN
and DELORES GRESHAM, individually
and on behalf of two classes of similarly
situated individuals